IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| ANGELA B. WEAVER and | ) | |
| DOMENICK SALVATORE, | ) | |
| individually and derivatively, as | ) | |
| limited partners, on behalf of AMD | ) | |
| SOUTHFIELD MICHIGAN | ) | |
| LIMITED PARTNERSHIP, a | ) | |
| Michigan Limited Partnership | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-1719 |
| | ) | Judge Terrence F. McVerry |
| MOBILE DIAGNOSTECH, INC., | ) | Magistrate Judge Lisa Pupo Lenihan |
| a Pennsylvania Corporation, MDX | ) | |
| CORPORATION, a Pennsylvania | ) | |
| Corporation, A. JEROME | ) | |
| DIGIACOBBE, JR., CALVIN F. | ) | |
| ZONTINE, and ALPHA MEDICAL | ) | |
| CONSULTANTS, INC., a Pennsylvania | ) | |
| Corporation | ) | |
| | ) | |
| Defendants. | ) | |


## REPORT AND RECOMMENDATION


**I.  RECOMMENDATION**

First, it is respectfully recommended that Plaintiff Salvatore's Motion for Partial

Summary Judgment on his claim for breach of fiduciary duty be denied. See Docket No. 204.

Second, it is respectfully recommended that the Defendants' Motion for Partial Summary

Judgment be denied as moot with respect to its assertions of both (a) absence of standing and/or

(b) time bar against Plaintiff Angela Weaver ("Weaver"), as this Report concludes that all claims

pending before the Court are derivative in nature and may proceed as properly brought by

Plaintiff Salvatore.  See Docket No. 205.[1]  Third, it is also respectfully recommended that

Defendants' Motion for Partial Summary Judgment be denied with respect to Plaintiffs' claims

under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. § 1962 *et seq.*

(hereinafter "RICO"),[2] as this Report concludes that this derivative civil action for mail fraud may

be maintained on the basis of the alleged misappropriations against the partnership, together with

the misrepresentations made by the controlling/managing partner(s) to the limited partners.

Finally, it is recommend that Plaintiffs be given leave to amend their pleading to allege a §

1962(c) "enterprise" within the parameters of the Third Circuit's holding in Jaguar Cars, Inc. v.

Royal Oaks Motor Car Co., Inc., 46 F.3d 258 (3d Cir. 1995).

---

1.  Were an individual action at issue in this case, which this Report concludes it is not, the question of Angela Weaver's standing would turn on the validity of the *inter vivos* transfer of Gerald W. Weaver's partnership interest, presently pending before the State Court.  Should the District Court disagree with this Report's assessment of the purely derivative nature of the claims, it is recommended that, in the interests of judicial efficiency, economy and comity, Defendant's Motion for Partial Summary Judgment on these matters be denied without prejudice to refile.  The Report notes that the Estate - which was previously closed and insolvent - was reopened by the State Court expressly to address the Defendants' contentions that Gerald Weaver's *inter vivos* transfer of partnership interest(s) to joint ownership with his spouse was invalid.  It is this Report's understanding that the case is proceeding before Judge Kelly in the Court of Common Pleas of Allegheny County, that a hearing was held on March 19, 2007, with the parties' briefs due on April 23rd.  The District Court has recently suggested that the parties may wish to defer further filings on related aspects of their dispute for an interval sufficient to afford the State Court an opportunity to render its decision.  See Memorandum Order of March 30, 2007, Civil Action No. 06-913 (vacating June 15, 2006 Order severing third-party claims against the Estate).  Cf. Transcript of January 26, 2007 Oral Argument ("Transcript") at 18-19 (Plaintiffs' observation that the Court need not reach the "hotly-contested" issue of whether Weaver was a limited partner because it has the derivative claims).  Note:  References to Transcript pages are to the Court's ECF page numbers.

2.  RICO provides a private civil action to recover treble damages for injuries resulting from a defendant's "racketeering activities" in violation of RICO's substantive criminal provisions.  18 U.S.C. § 1964(c).

In so recommending, this Report necessarily reaches the "substantial question" expressly left open by the Supreme Court last June,[3] on which neither the Third Circuit nor this District Court has previously spoken, and on which our Sister Court in the Eastern District of Pennsylvania is in recent and express internal disagreement.[4]   The question, as left open by the Supreme Court in Anza, is "whether a showing of reliance [by the plaintiff] is required" to assert a RICO claim predicated on mail fraud.  126 S.Ct. at 1998.[5]   More particularly, as this Court has

---

3.  See Anza v. Ideal Steel Supply Corp., 126 S.Ct. 1991 (2006).

4.  Compare Walter v. Palisades Collection, LLC, 2007 WL 959043 (E.D. Pa. March 28, 2007) (concluding that plaintiff's reliance upon a misrepresentation is required to maintain a civil RICO action predicated on mail fraud) with Grider v. Keystone Health Plan Central, Inc., 2006 WL 3825178 (E.D. Pa. Dec. 20, 2006) (concluding that RICO mail fraud does not incorporate a requirement of reliance from common-law fraud).  See also Walter, 2007 WL 959043, *7 (noting that "[a]lthough the majority of the circuit courts and district courts within this circuit to address the issue have held that [reliance is necessary to establish proximate cause], the Third Circuit has not yet weighed in"); id. (citing Baker v. Family Credit Counseling Corp., 440 F. Supp.2d 392, 410 (E.D. Pa. 2006) ("There is no definitive Third Circuit case on the subject."); Grider, 2006 WL 3825178, *20 ("We have found no decision by the . . . Third Circuit which squarely addresses whether reliance is an element that needs to be established in a civil RICO action based upon mail . . . fraud.").

5.  In Anza, the petitioners asked the Supreme Court "to hold, in line with the District Court's decision granting [their] motion to dismiss, that a plaintiff may not assert a RICO claim predicated on mail fraud . . . unless it demonstrates it relied on the defendant's misrepresentations" in accordance with the principles and requirements of common law fraud. 126 S.Ct. at 1998.  The Court concluded it need not address that question because the RICO claim failed for lack of proximate cause under Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258 (1992), where the relationship between the plaintiff-competitor's market-share disadvantage (the asserted injury) and the defendant's non-payment of State sales tax (the asserted fraud on the State, which reduced defendant's product costs) was too indirect, speculative and attenuated. See 126 S.Ct. at 1996-97.

   As our Sister Court in the Eastern District has noted, this was the second time in recent years the Supreme Court has declined to clarify the issue.  See Walter, 2007 WL 959043, *7 (citing Bank of China v. NMB LLC, 126 S.Ct. 675 (2005) (mem.) (dismissing certiorari for a previously granted petition that would have considered whether "civil RICO plaintiffs alleging mail and wire fraud as predicate acts must establish 'reasonable reliance' under 18 U.S.C. § 1964(c)")).

come to understand after exhaustive research, the "reliance" question - addressed with varying results by other Circuits - breaks down into two analytical components: (a) whether a deception/misrepresentation by the defendant is an essential element of civil RICO mail fraud, because the statute incorporates the elements of common law fraud; and (b) if so, whether reliance by the plaintiff is also essential because the requisite proximate cause cannot otherwise be met, or whether there may be instances in which a sufficiently direct relation between the injury asserted and the defendants' conduct can be established nonetheless.

This Report concludes that (a) as a threshold matter, it is not clear that RICO fraud requires deception/misrepresentation in a fiduciary context (*i.e.*, some cases in this limited line appear to recognize "constructive fraud"), and (b) defendant's misrepresentations to third-parties, their reliance thereon, and resultant injury to the plaintiff provide, in the case *sub judice*, a just basis for proximate cause.[6]  That is, although there was no reliance by the plaintiff in this derivative action (*i.e.*, no misrepresentation to or reliance by the limited partnership itself, as the Defendants misappropriated from the partnership by their exercise of control as its managing/general partner(s)), the Defendants' fiduciary relationships to the partnership injured, together with their misrepresentations/omissions against the limited partners, *i.e.*, those standing in the best position to protect AMD from the Defendants' self-dealing, are sufficient - if established at trial - to give rise to liability for civil mail fraud.

## II.  REPORT

### A.  Statement of Facts

---

6.  See *infra* pp. 45-51.

Plaintiff Angela Weaver is the surviving spouse of Gerald Weaver, who was a limited partner in - and served as legal counsel to - Plaintiff AMD Southfield Michigan Partnership ("AMD"), a Michigan limited partnership formed in 1985 to operate a magnetic imaging ("MRI") center in Southfield, Michigan.[7]  Plaintiff Domenick Salvatore ("Salvatore") is a limited partner in AMD.  The Individual Defendants, A. Jerome DiGiacobbe ("DiGiacobbe") and Calvin F. Zontine ("Zontine") are the controlling partners of AMD, and of its managing general partner, Mobile Diagnostech, Inc. ("MDI"), a Pennsylvania close corporation.[8]

---

7.  As noted, the parties dispute whether (a) there was a valid *inter vivos* transfer of Mr. Weaver's partnership interest to a joint tenancy with his spouse, or (b) the partnership interest passed, as an individual asset, to the Estate.  Litigation of this matter has been pursued by the parties in State Court, as the Estate was re-opened at Defendants' behest.  See *supra* n. 1.

8.  Although the partnership and its administrative services varied somewhat over time, majority ownership and operation of AMD rested in the Individual Defendants or in a managing entity controlled by the Individual Defendants throughout the relevant time period.  See Transcript at 26-32; Plaintiffs' Concise Statement of Material Facts at 2 (stating that "MDI has been the controlling general partner of AMD since approximately June 15, 1986" and "has authority over AMD's financial affairs"); August 7, 2003 Report and Recommendation of Magistrate Judge Sensenich (hereafter the "August 2003 R&R") at 3-5 (providing time-line of general partners and management/administrative service providers); Joint Statement of Material Facts (noting that MDI performed administration for AMD from March 1986 through December 1995, after which it was performed by MDX through calendar year 2000).

Cf. Braszo v. DiGiacobbe *et al.*, GD03-006940, Court of Common Pleas of Allegheny County, Pennsylvania, July 29, 2005 Findings of Fact of J. Folino at ¶ 11 ("At all relevant times . . . MDI was the managing general partner of AMD.") In Braszo, a former secretary/bookkeeper for MDI and other real estate limited partnerships managed by the Individual Defendants, brought suit regarding the adequacy of consideration received for transfer of her 1% interest in AMD to DiGiacobbe following termination of her employment. Following trial, the Court entered a defense verdict, holding, principally, that Braszo was aware of outstanding loans from AMD to MDI at the time of the stock purchase negotiation, and that the purchase price was negotiated to include consideration for the "undistributed profit" impact of said loans on Braszo's interest in AMD.  See id. at 5.

The partnership disputes at issue in this factually and legally complicated action, pending in Federal Court for approximately four and one-half (4-1/2) years, stem essentially from alleged protracted mismanagement of and misappropriations from AMD by the controlling Individual Defendants through over-reaching and self-dealing in the forms of (a) unauthorized[9] and purposefully concealed, non-interest or inadequate-interest bearing, loans made from AMD to MDI (the "MDI Loan Claims");[10] and (b) unauthorized and purposefully concealed, non-interest bearing, no-recourse loans from AMD to DiGiacobbe and Zontine relating to the unauthorized

---

9. By "unauthorized" the Report refers to actions allegedly taken in breach of the Partnership Agreement and absent authority therein. Because MDI was the managing general partner of AMD, and the Individual Defendants were the controlling partners, the Report notes that the Defendants had the power (albeit not the authority) to engage in the alleged mismanagement, self-dealing, and/or misappropriation. That is, no "trickery" or "deception" was practiced upon AMD itself, or a third-party in control of AMD's assets, in order to effectuate either (a) the loans to MDI or (b) the partnership interest transfers and related loans to the Individual Defendants. These acts were completed (*e.g.*, the necessary documents were executed) via the Defendants' control. See discussion *infra*.

It is asserted that the Defendants fraudulently concealed their bad acts from the limited partners by misrepresentation and/or omission. See, *e.g.*, Plaintiff's Supplemental Brief in Opposition to Defendants' Motion for Partial Summary Judgment at 2 (discussing "Defendants' fraudulent acts in withdrawing millions of dollars from AMD, in direct breach of the partnership agreement, for Defendants' own purposes, and then covering up the withdrawals" by altered tax returns and "deceptively describ[ed]" financial statements). The Individual Defendants assert that Gerald Weaver participated in and authorized their actions as partner and general counsel.

It is also asserted that the Defendants subsequently fraudulent interfered with and delayed the limited partners' rights to an accounting review. See, *e.g.*, Brief in Opposition to Defendants' Motion for Partial Summary Judgment at 5-6.

10. See Brief in Support of Motion for Partial Summary Judgment at 2-3 (asserting that Defendants took over $6 million in loans from AMD between 1991 and 2000). Defendants maintain that these loans were repaid in 2000, with interest. See Defendants' Memorandum in Opposition at 22.

transfers of additional partnership interests from AMD to the Individual Defendants (the "Partnership Interest Claims").[11]

The Plaintiffs allege various State law causes of action, including breach of fiduciary duty, conversion and "fraud/fraudulent concealment (including constructive fraud)".[12]  They further allege mail fraud and liability, including liability for treble damages, under the Federal RICO statutes.  While the Complaint was initially filed by Angela Weaver, when her standing was challenged, Salvatore joined this action as an additional Plaintiff.

The plethora of motions and other pleadings filed in this action, together with the number and variety of the parties' incidental disputes, has been staggering.  There have been no less than 235 docket entries, and numerous voluminous exhibits/appendices, filed during the pendency of this action.[13]  The parties' cross-motions for partial summary judgment alone have resulted in approximately thirty (30) docket entries, and their Joint Statement of Facts includes

---

11. See Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion for Partial Summary Judgment at 3 (asserting that Defendants "caused AMD to pay for the shares and immediately assigned the shares to themselves", taking "millions of dollars of profit distributions" and only repaying AMD years later); id. (asserting that Defendants "acquired the shares via 'self-liquidating' unauthorized loans").  See also Plaintiffs' Statement of Claims at 2 (asserting that Defendants "converted to themselves AMD limited partnership interests that had been acquired by AMD with its own funds, and retained over $5 million in profit distributions made with respect to such interests (through 6/30/05)").

12.  Plaintiffs' Statement of Claims at 1. See also id. at 2 ("Since approximately 1989 and continuing at all relevant times through at least 2001, Defendants have engaged in a widespread pattern of fraudulent self-dealing, conversion, and fraudulent concealment to the detriment of Plaintiffs and AMD.").

13.  In addition, Defendants' third-party claims against Weaver, as Executrix of her husband's Estate, were severed, as recommended by Magistrate Judge Sensenich, by Order of June 15, 2006.  Shortly thereafter, Judge Sensenich recommended dismissal of the separate action for lack of diversity jurisdiction.  See Civil Action 06-913, Docket #11, July 12, 2006.  Severance of the third-party claims was vacated by the District Court's Order of March 30, 2007.  See supra n. 1.

approximately 170 exhibits.  Most recently, Plaintiffs filed a Motion to Stay regarding the parties' afore-described cross-motions for partial summary judgment, which Motion was denied.[14]  Oral argument was heard at length, most extensively on Defendants' request for summary judgment on the RICO claims.[15]

### B. Motion for Summary Judgment

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The non-moving party must set forth specific facts showing that there is a genuine issue for trial.  Id.  The court draws all justifiable inferences in the non-movant's favor, but a genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The non-movant must present sufficient evidence as to each element of its case for which it will bear the burden at trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 595-86 (1986).

---

14. Plaintiff requested that this Court stay its consideration of the motions for summary judgment to await issuance of the Pennsylvania State Court's opinion on the *inter vivos* transfer. As there is, however, no question of Plaintiff Salvatore's standing to maintain his claims, this Court need not delay its proceedings at this time.

See Docket at February 5, 2007 (text-only Order denying Motion to Stay, Docket No. 227). While this Motion incorporated Defendants' additional requests to deny Plaintiff's Motion for Partial Summary Judgment without prejudice to renew, or to administratively terminate the same, these requests would be rendered moot by the recommendations of this Report.

15. See Transcript.

C.  **Analysis**

1.  Plaintiff's Motion for Partial Summary Judgment on a Breach of Fiduciary Duty

Defendants assert that summary judgment on this claim is precluded because Salvatore does not fairly and adequately represent AMD's partners for purposes of a derivative action where his failure to include the Estate of Gerald Weaver as a Defendant reflects "an antagonistic interest and insurmountable conflict."  Defendants' Memorandum of Law in Opposition at 9-10.[16] The joinder of this currently closed and asset-less Estate is not necessary.  The named Defendants held controlling interests in AMD and/or its general partner(s) during the relevant time period.[17] And liability for breach of fiduciary duty turns on whether a fiduciary is unjustly enriched by its actions.  A partner-plaintiff who seeks redress in a derivative action to remedy a particular wrong done to the partnership is not obliged to undertake to remedy every other wrong done by every other person as a prerequisite.  Nor need such plaintiff let a defendant direct his case strategy for him.  Nor is the acquiescence of some or a majority of the other partners requisite to that plaintiff's standing.[18]

Defendants also assert that summary judgment is precluded because, under more general provisions of the Partnership Agreement, the general partner(s) were authorized to exercise discretion in acting in the best interest of AMD and the loans to MDI *were* in AMD's best

---

16.  See also id. at 11 (alleging that Salvatore does not have the support of the other limited partners in pursuing this action against the Defendants).

17.  See *supra* n. 8.  Cf. Defendants' Memorandum of Law at 12-15 (asserting that Defendants did not "control" AMD because they consulted with Weaver, included him in decision-making, and sometimes deferred to his advice as legal counsel).

18.  Compare Vanderbilt v. Geo-Energy Ltd., 725 F.2d 204, 207 (3d Cir. 1983) (discussing considerations in representation, including that representative not have "economic antagonisms" or predominately personal interests).

interest, as they were essential to MDI's continued viability and the partnerships were inter-dependent.  See Defendants' Memorandum in Opposition at 15-17.[19]   The fact remains, however, that the Partnership Agreement at issue contains a clear and express prohibition against such loans,[20] and the general language cited by the Defendants is insufficient to overcome it.  If the Defendants believed loans to MDI were in AMD's best interest, they were obligated by the terms of the Partnership Agreement to obtain permission by, *e.g.*, amendment or modification of that Agreement.  Defendants' assertions as to the ultimate effects of the unauthorized loans may mitigate damages, but they do not affect the appropriateness of summary judgment on the underlying claim.

Finally, Defendants assert that, under Michigan law,[21] summary judgment is precluded because Plaintiff has "fatally misstated" his claim, *i.e.*, that breach of fiduciary duty, a common-law tort, cannot be based on Defendants' alleged violations of portions of the Partnership Agreement prohibiting "loans to general partners and their affiliates, commingling of AMD funds, and use of AMD funds for non-AMD purposes", as this states only a claim for breach of contract.  See  Defendants' Memorandum in Opposition at 7 (citing Tennen v. Hyman, 2004 WL 1292501 (Mich. App. June 10, 2004)).

---

19.  See also id. at 16 (further asserting that AMD was a "resoundingly successful investment" for its partners).

20.  See Joint Statement of Material Facts at ¶¶ 22-23.

21.  As Defendants note, this pendant State law claim is governed by Michigan law.  See, *e.g.*, Defendants' Memorandum of Law in Opposition to Salvatore's Motion for Partial Summary Judgment at 4-5; Plaintiff's Surreply in Further Opposition to Defendant's Motion for Partial Summary Judgment at 2 (same).

Defendants are correct that a claim for breach of fiduciary duty must arise from "a breach of a duty separate and distinct from the duties imposed by contract." <u>Tennen</u>, <u>supra</u> (citing <u>Nelson v. Northwestern Savings & Loan Ass'n</u>, 381 N.W.2d 757 (1985)). The Report notes, however, that Plaintiff's claim for breach of fiduciary duty is premised upon both the MDI Loan Claims and the Partnership Interest Claims, and the misappropriations and misrepresentations made with respect thereto.[22]  Defendants' argument fails to consider the fiduciary duties imposed by common law and statute in the partnership context.  That is, while the law of a partnership may be largely its Partnership Agreement, a partnership is not entirely defined thereby.[23]

More specifically, and in accordance with Michigan's adoption of the Uniform Partnership Act (the "UPA"), every partner "must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the . . . conduct . . . of the partnership or from any use by him of its property."  <u>Band v. Livonia Assocs.</u>, 439 N.W.2d 285, 293 (Mich. App. 1989).  Every partner is also under general obligations to deal fairly, openly, and honestly in matters concerning the partnership.  <u>See</u> <u>id.</u> (noting that Section 20 of the UPA "has been broadly interpreted as imposing a duty to disclose all known information that is significant and material to the affairs or property of the partnership") (citing <u>Jaffa v. Shacket</u>, 319 N.W.2d 604 (Mich. App. 1982)).  <u>See also</u> <u>id.</u> at 294 (noting that "courts universally recognize the fiduciary relationship of partners and impose on

---

22.  <u>See</u>, <i>e.g.</i>, Plaintiffs' Statement of Claims at 3-4.

23.  <u>See</u> Memorandum of Law In Support of Motion for Partial Summary Judgment at 9 (noting that the "self-dealing conduct" evidenced by the documents of record "constitutes a breach of fiduciary duty under the express terms of the [Partnership Agreement] and controlling law"); Reply Brief in Further Support of Plaintiff's Motion for Partial Summary Judgment at 15-17.

them obligations of the utmost good faith and integrity in their dealings with one another in partnership affairs"); Lincoln Nat. Life Ins. Co. v. Silver, 966 F.Supp. 587, 619 (N.D. Ill. 1995) ("A partner may breach his fiduciary duties in several ways.  For example, a partner breaches his fiduciary duty by appropriating partnership funds to his own use, or by failing to be completely honest, open and fair in the provision of information to co-partners.") (citations omitted); Central Cartage v. Fewless, 591 N.W.2d 422 (Mich. App. 1998) (stating that "a fiduciary owes a duty of good faith to his principle and is not permitted to act for his private advantage or otherwise contrary to the interests of his beneficiary or principle in matters affecting the fiduciary relationship"); Peacock v. Landquest, Lmtd., 52 F.3d 326 (6th Cir. 1995) (discussing finding of state court jury that defendant partner breached both the partnership agreement and his fiduciary duties).[24]

Questions of whether a partner breached such distinct fiduciary duties as, *e.g.*, loyalty, care, and honesty encompass, necessarily, both (1) the knowledge, understanding and/or intent of the partner; and (2) the particular circumstances of the acts alleged.  These are matters

---

24.  Claims for breach of fiduciary duty in a partnership context are uniformly recognized by the Federal Courts.  See, *e.g.*, Koester v. Amer. Repub. Investments, Inc., 11 F.3d 8181 (8th Cir. 1993) (limited partner's claim for breach of fiduciary duty arising from mismanagement, including mishandling assets and failing to account); Sunseri v. Proctor, 2007 WL 1287824 (E.D. Mich. May 2, 2007) (discussing New York related bench trial on breach of fiduciary duty and breach of contract in partnership context); Long Development, Inc. v. Oak Park Village Limited Partnership, 117 F.3d 1240 (6th Cir. July 2, 1997); Saxe v. Dlusky, 2006 WL 27275 (6th Cir. Jan. 6, 2006) (discussing state law claims for breach of fiduciary duty and contract regarding buyout under accountant's partnership agreement).  Cf. Bohler-Uddeholm Amer. Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001) (holding that obligations allegedly breached with regard to tort claim of breach of fiduciary duty were imposed under social policy rather than by mutual consensus); Bullmore v. Banc of Amer. Sec., LLC, 2007 WL 1225549 (S.D.N.Y. April 27, 2007) (noting that where social policy against fraud/deceit gives rise to action for breach of fiduciary duty, it is not duplicative of contract claims).

traditionally and properly within the purview of the fact-finder. And, as to these, the pleadings and documents of record clearly reflect disputed issues of material fact. While summary judgment in Plaintiff's favor is, therefore, precluded, the claim itself is not, and should proceed to trial.

      2. <u>Defendants' Motion for Partial Summary Judgment on Absence of Standing and Time Bar Against Angela Weaver</u>

      The Report recommends denial of these aspects of Defendants' Motion for Partial Summary Judgment as moot because it concludes that all claims before this Court are solely derivative in nature. Continuation of this derivative action may be based on Plaintiff Salvatore's standing, which is not open to dispute. Accordingly, the issue of Weaver's standing as a limited partner (and the dependent issue of a statute of limitations bar against her claims), which turns on questions presently before the Pennsylvania Court, need not be reached. <u>See</u> *supra* nn. 1, 7 and 14. <u>See also</u> discussion, *infra*, at § 3(c) (derivative nature of claims).[25]

      3. <u>Defendants' Motion for Summary Judgment on Plaintiffs' Racketeer Influenced and Corrupt Organizations Act ("RICO") Claims</u>

      a. <u>Essential Elements of RICO</u>

      Plaintiffs have asserted claims against the Defendants under 18 U.S.C. §§ 1962 (b), (c), and (d). <u>See</u> Plaintiffs' Statement of Claims.

      The RICO statute provides that

---

25. For a discussion of the statute of limitations for civil RICO claims, and a history regarding interpretations of when the four-year period begins (including injury discovery and injury occurrence rules), <u>see generally</u> <u>Mathews v. Kidder Peabody & Co., Inc.</u>, 260 F.3d 239, 245 (3d Cir. 2001); <u>cf.</u> <u>id.</u> at 250-52 (discussing "inquiry notice" and "storm warnings" in the securities fraud context).

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964 (c).  In turn, § 1962 (c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  Of the remaining subsections, § 1962(a) makes it unlawful for any person who has received income derived from a pattern of racketeering activity to use/invest it in the acquisition/operation of an enterprise engaged in or affecting interstate or foreign commerce; § 1962 (b) prohibits any person from employing a pattern of racketeering to acquire/maintain an interest in/control of any such enterprise;[26] and § 1962(d) prohibits conspiring to violate one of the other three RICO subsections.

In order to establish a violation of § 1962 (c), Plaintiffs must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004).  The term "racketeering activity" is defined in a list of various state and federal offenses set forth at 18 U.S.C. § 1961 (the "predicate acts"), and includes the mail fraud statutes found at § 1341.  A "pattern of racketeering activity" is established with proof of the commission of at least two predicate acts within a ten-year period.  Id. at § 1961(5).

The elements of the predicate act of mail fraud are "(1) the existence of a scheme to defraud; (2) the participation by the defendant in the particular scheme with the specific intent to

---

26.  See Lighting Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1188 (3d Cir. 1993) (holding that injury under § 1962(b) arises when, e.g., the owner of an enterprise infiltrated by the defendant as a result of racketeering activities is injured by the defendant's acquisition or control).

defraud; and (3) the use of the United States mail . . . in furtherance of the fraudulent scheme."
United States v. Syme, 276 F.3d 131, 142 n. 3 (3d Cir. 2002).  As to these elements, the Third

Circuit has held that the scheme to defraud "need not be fraudulent on its face, but must involve

some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons

of ordinary prudence and comprehension."  United States v. Pearlstein, 576 F.2d 531, 535 (3d

Cir. 1978).  It has also observed that a specific intent to defraud "may be found from a material

misstatement of fact made with reckless disregard for the truth."  United States v. Coyle, 63 F.3d

1239, 1243 (3d Cir. 1995) (quoting United States v. Hannigan, 27 F.3d 890, 892 n. 1 (3d Cir.

1994)).  Finally, although the third element requires that the use of the mail be in furtherance or

execution of the scheme to defraud, and the scheme is generally considered complete at the point

the fruits of the efforts are obtained,[27] an exception is made for "lulling letters."  Thus,

correspondence that preserves or creates a false appearance of legitimacy and thus postpones

detection of a fraud, even though issued after-the-fact, meets the "in furtherance" element of mail

fraud.[28]  It is important to note, however, that the misrepresentation/omission of a lulling letter

does not supplant the RICO requirement of an *underlying* fraud.  Rather, lulling letter

jurisprudence simply creates an exception to the general rule that, where the underlying fraud has

been completed, subsequent fraudulent correspondence does not constitute "use of the mail" in

furtherance.[29]

---

27. See Kann v. United States, 323 U.S. 88, 94 (1944).

28. See United States v. Sampson, 371 U.S. 75 (1962); Kehr Packages, Inc. v. Fidelcor, Inc.,
926 F.2d 1406, 1416 n. 3 (3d Cir. 1991).

29. See, *e.g.*, Kehr, 929 F.2d at 1416 n. 3 (3d Cir. 1991) (holding that although actual RICO
violation is the mailing, it must relate to an underlying fraudulent scheme and instances of

(continued...)

Plaintiffs' filings and argument before this Court reflect their understandable desire to maintain, with minimal further delineation, that because Defendants assertedly misappropriated loans and partnership interests from AMD, and concealed their bad acts from Plaintiffs and other limited partners, Plaintiffs were defrauded within the scope of RICO. More particularly, Plaintiffs appear to believe that, as they must have either an individual or a derivative claim against the Defendants, and double-recovery is barred, the question of *which* is irrelevant to summary judgment and they should be allowed to proceed.[30] Would it were so simple. To the contrary, however, each element of a RICO claim must be met by sufficiently particularized allegations.[31] And parsing the questions (*i.e.*, the RICO elements) significantly complicates (as is

---

29. (...continued)
deceit); id. (permitting predication on post-completion mailings "designed to lull the victims into a false sense of security, postpone their ultimate complaint . . ., and therefore make the apprehension of the defendants less likely").

30. See Transcript at 44 ("Is the harm to the corporation or is it to the shareholders? And we submit that we have both types of harm here, but we certainly have one or the other. You can't - the Court shouldn't come to the conclusion that there's no injury here. There's obviously some injury."); id. at 45 (noting that some courts "allow the suing limited partners to sue in both capacities . . . Then they say, appropriately, no double recovery. If the partnership gets it, you're not going to get it again. We would submit that's an entirely appropriate way to handle it."). See also Plaintiffs' Supplemental Brief at 5, n. 4 (proposing that the Court has the discretion to permit Plaintiffs' individual claims to proceed with their derivative claims so long as there is no double recovery).

31. Although RICO claims are generally subject to the notice pleading requirements of Rule 8(a), RICO allegations sounding in fraud are subject to the heightened pleading standards of Rule 9(b), and must be stated with particularity. See Lum v. Bank of America, 361 F.3d 217, 223-24 (3d Cir. 2004); Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).

In the context of RICO fraud allegations, the complaint must "identify the purpose of the mailing within the defendant's fraudulent scheme and specify the fraudulent statement, the time, place, and speaker and content of the alleged misrepresentation." Annulli v. Panikkar, 200 F.3d 189, 201 n. 10 (3d Cir. 1999). See also Bonavitacola Elec. Contractor, Inc. v. Boro Developers,

(continued...)

often the case) the answers.  While a number of the asserted or potential grounds for summary

judgment on these claims have proved straight-forward, one has proved difficult.

      b.  <u>Defendants' Asserted Grounds for Summary Judgment</u>

      Defendants' asserted bases for summary judgment on RICO may, by and large, be

quickly dispensed with:

      First, Defendants assert that Plaintiffs' claims must fail because their damages are too

remote or speculative.  <u>See</u>, <i>e.g.</i> Defendants' Brief in Support of Motion for Partial Summary

Judgment at 16-19 (citing <u>Holmes v. Securities Investor Protection Corp.</u>, 503 U.S. 258 (1992)).[32]

In <u>Holmes</u>, the Supreme Court held that the Securities Investor Protection Corporation could not

maintain a RICO action for reimbursement of customer claims where those claims resulted from

the defendant's alleged participation in a stock manipulation scheme that injured two broker-

dealers, leaving the brokers unable to pay their customers.  The Court explained that a plaintiff

"complain[ing] of harm flowing merely from the misfortunes visited upon a third person by the

defendant's acts was generally said to stand at too remote a distance to recover."  503 U.S. at 268-

69; <u>id.</u> at 271-72 (noting that "[t]he general tendency of the law, in regard to damages at least, is

not to go beyond the first step").[33]  Similarly, in <u>Associated General Contractors of Cal., Inc. v.</u>

---

31.  (...continued)
<u>Inc.</u>, 2003 WL 23155074 at *3 (3d Cir. Dec. 8, 2003) ("Put another way, the 'who, what, when
and where details of the alleged fraud' are required.") (citations omitted).  <u>Cf.</u>  <u>Seville Indus.</u>
<u>Mach. Corp. v. Southmost Mach. Corp.</u>, 742 F.2d 786, 791 (3d Cir. 1984) (observing that while
Rule 9(b) requirement may be satisfied by means other than delineating "date, place, or time",
plaintiff must "inject[] precision and some measure of substantiation into allegations of fraud").

32.  <u>See also</u> Transcript at 23-24 (Defense counsel's assertion that plaintiffs' injuries are too
remote and indirect to confer standing).

33.  The <u>Holmes</u> Court also expressed concerns regarding the complicated apportionment of

                                                        (continued...)

Carpenters, 459 U.S. 519 (1983), the Court focused on the "tenuous and speculative character of

the relationship between [an] alleged antitrust violation and the [plaintiff]'s alleged injury." Id. at

545.  In contrast, the derivative damages *sub judice* are related directly to the alleged fraud, not to

possible indirect effects of the fraud.  A determination of damages in this case is, therefore, well

within the Court's expertise.

Second, Defendants assert that they are entitled to summary judgment because Plaintiff

Weaver lacks standing and/or is time-barred.  These grounds are mooted by the standing of

Plaintiff Salvatore to maintain these derivative claims, as discussed *supra*.

Third, Defendants assert that Plaintiffs have failed to evidence the specific intent

necessary to maintain a claim for mail fraud.  See Defendants' Brief in Support at 24-26.  As

noted, *supra*, the Third Circuit has observed that a specific intent to defraud "may be found from

a material misstatement of fact made with reckless disregard for the truth."  United States v.

Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995) (quoting United States v. Hannigan, 27 F.3d 890, 892 n.

1 (3d Cir. 1994)). It has also held that "a plaintiff need not offer direct evidence of intent" but

"[r]ather, the fact finder may infer a defendant's knowledge and intent from circumstantial

evidence."  Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc., 46 F.3d 258, 270 (3d Cir.

1995)(citations omitted).  See also Herman & MacLean v. Huddleston, 459 U.S. 375, 390 n. 30

_____

33.  (...continued)
   damages that recognition of such indirect claims would entail.  See 305 U.S. at 269, 273 (noting
   that it would be difficult to determine how much of the brokers' failure to pay was due to the
   defendant's fraud and how much was due to other factors affecting the brokers' business
   success).  Cf. Anza, 126 S.Ct. At 2002 (Thomas, J., dissenting) ("[The Court in Holmes] held
   that one reason that *indirect* injuries should not be compensable is that such injuries are difficult
   to ascertain . . . . [It] did not adopt the converse proposition that any injuries that are difficult to
   ascertain must be classified as indirect for purposes of determining proximate causation.")
   (emphasis in original).  Compare Defendants' Brief in Support at 18 (arguing that injury
   attributable to the MDI loans would be extremely difficult to ascertain).

(1983); <u>Michalic v. Cleveland Tankers, Inc.</u>, 364 U.S. 325, 330 (1960) (holding that circumstantial evidence is sufficient to demonstrate fraudulent intent).  In this case, the requisite scienter could properly be inferred from the facts alleged.  Defendants' arguments that documents alleged to contain misrepresentations were required to be provided to the limited partners (by, *e.g.*, the partnership agreement or federal law) are not relevant to their assertion of entitlement to summary judgment on RICO.  <u>See</u>, *e.g.*, <u>Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio</u>, 900 F.2d 882, 886 (6ᵗʰ Cir. 1990).  <u>See</u> also discussion of "lulling letter" jurisprudence, *supra*.  <u>Compare</u> Defendants' Brief in Support at 26-27 (observing that "routine mailings required by law which are themselves intrinsically innocent" cannot support a mail fraud prosecution) (quoting <u>United States v. Cross</u>, 128 F.3d 145, 150 (3d Cir. 1997); <u>id.</u> at 27 (noting that the disputed mailing were made in connection with the management and administration of AMD and would have been made regardless of any scheme to defraud).[34]

Fourth, Defendants assert that Plaintiffs cannot maintain an action under § 1962(b) because there is no evidence that Defendants acquired or maintained any interest in or control of AMD through the alleged mail fraud.  <u>See</u> Defendants' Brief in Support at 27-29.  This Report concludes, for reasons discussed fully *infra*, that triable issues exist as to (a) whether  Defendants maintained their interests in AMD, and/or acquired additional interests, through misappropriation-related misrepresentations to the limited partners and (b) what injury resulted.

Fifth, Defendants assert that Plaintiffs cannot maintain an action under §1962(c) because AMD cannot be both the RICO enterprise and its own victim.  <u>See</u> Defendants' Brief in Support at 30.  This distinction is well taken.  <u>See</u> <u>Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.</u>, 46 F.3d

---

34.  <u>See</u> also Transcript at 36.

258, 266-67 (3d Cir. 1995) (noting that the Supreme Court has "held that the 'enterprise' in

subsection (c) is properly viewed as the 'vehicle through which the unlawful pattern of

racketeering is committed, rather than the victim of that activity'" and concluding, therefore, that

a victim corporation could not reasonably be viewed as the RICO enterprise) (quoting Scheidler);

National Organization for Women v. Scheidler, 510 U.S. 249, 259 (1994); Reves v. Ernst &

Young, 494 U.S. 56 (1990).[35]

_____

35.  Plaintiffs observe that this Court, in ruling on Defendants' Motion to Dismiss, held that
there is no requirement that the enterprise and the victim be distinct, merely that the RICO-liable
"person" (i.e., defendant) and the enterprise be distinct.  It further concluded that the language of
Jaguar Cars and Scheidler to the contrary was dicta and, as such, was insufficient basis to
dismiss the Complaint.  See August, 2003 Report and Recommendation at 23-24.  Plaintiffs
assert, therefore, that the Defendants are barred from "re-litigating this argument" by the "law of
the case."  See Brief in Opposition to Defendants' Motion for Partial Summary Judgment at 48-
49.  But cf. Transcript at 71 (Plaintiff's counsel's acknowledgment of the existence of post-
Jaguar Cars decisions in District Courts of the Third Circuit imposing a separate victim-
enterprise rule); Kaiser v. Stewart, 965 F.Supp. 684, 687 n. 4 (E.D. Pa. 1997) (concluding that,
under RICO, the victim and enterprise cannot be the same entity or person) (citing Jaguar Cars
and Scheidler); LaSalle Bank Lake View v. Seguban, 54 F.3d 387 (7th Cir. 1995) (same, citing
Jaguar Cars).

        The Report, having considered carefully the language of the Third Circuit's decision in
Jaguar Cars and further discussion/elucidation of such language available through decisions of
our Sister Court in the Eastern District of Pennsylvania and scholarly commentary published
subsequent to the August 2003 Report and Recommendation, concludes that Jaguar Cars clearly
requires that the 1962 (c) "person" and "enterprise" be distinct, and holds that such distinctness
can be met by officers and employees managing the affairs of a corporation-enterprise through a
pattern of racketeering, i.e., corporate officers and directors are not shielded by their control of
the RICO enterprise from § 1962(c) liability.  See Cedric Kushner Promotions Ltd. v. King, 533
U.S. 158 (2001).

        The Report further concludes, however, that under Jaguar Cars, which remains the law of
this Circuit, the §1962(c) "enterprise" must also be distinct from the "victim" of the racketeering.
See Jaguar Cars, 46 F.3d 258, 266-67 (3d Cir. 1995) (concluding, as a fundamental element of its
analysis, that the Circuit's prior interpretation of § 1962(c) as encompassing circumstances in
which the "enterprise" was also a "victim" was "in direct conflict" with the Supreme Court's
later decisions in Reves and Scheidler); id. (further concluding, "[c]onsequently", that "a victim
corporation 'drained of its own money' by pilfering officers and employees could not reasonably

(continued...)

Nonetheless, and although the pleadings allege only that AMD was the RICO enterprise, during oral argument in January of this year, Plaintiffs expressly proffered the alternative assertion that MDI was the RICO enterprise.  See Transcript at 68, 94-95 (requesting leave to amend to allege that MDI was RICO enterprise if Court concludes that AMD could not be); id. at 70 (suggesting that issue is, accordingly, "easily dealt with").  It is clear that, under Jaguar Cars, the § 1962(c) enterprise may be either a formal legal entity through which the individual defendants conducted their alleged racketeering (e.g., AMD's general/managing partner, MDI) or an association of individual employees who were victimizing the § 1962(c) claimant.  See 46 F.3d at 264-268; 268-69 (citing the "conjunctive definition of 'enterprise' which includes both 'legal entit[ies] and any . . . group of individuals associated in fact'") (quoting 18 U.S.C.A. § 1961(4)); id. at 269 (citing McCullough v. Suter, 757 F.2d 142, 144 (7th Cir. 1985)).  Accordingly, it is

_____

35.  (...continued)
be viewed as the enterprise through which employee persons carried out their racketeering activity") (emphasis in original).  See also Transcript at 69 (Plaintiffs' counsel's quotation to this Third Circuit statement); Lee Applebaum, Is There a Good Faith Claim for the RICO Enterprise Plaintiff, 27 Del. J. Corp. Law 519, 520, 540, 542, 546 (2002) (providing a thorough dissection of Jaguar Cars; noting that (a) the Third Circuit "found that a RICO enterprise . . . could not also be the victim", and (b) it "was critical to Jaguar Cars' conclusions to permanently inter the idea that the . . . enterprise was the passive victim of criminal infiltration"; and concluding, given that the decision's reasoning on enterprise-victim was "intertwined" with its holding, that it was unlikely that a plaintiff could assert it was dicta); id. at 540 ("The Jaguar Cars panel ultimately concluded that § 1962 (c) enterprises were vehicles for harm, via their operation by others, and not victims of harm."); id. at 561 (concluding nonetheless that none of the underlying principles relied on in Jaguar Cars or related Supreme Court cases are "inconsistent with punishing an insider for operating an enterprise contrary to its own interests").

This minor difference of interpretation from the Court's prior conclusion several years ago on a Motion to Dismiss is, however, as the Plaintiffs readily acknowledge, a technical matter easily resolved by amendment of the pleadings.  See discussion at text.  Cf. Smith v. Onan Corp., 737 F.2d 339, 345 (3d Cir. 1984) (observing that the "law of the case doctrine directs a court's discretion, it does not limit the tribunal's power").

recommended that Plaintiffs be granted leave to amend their pleading to properly allege AMD's claim under § 1962(c).[36]

    c. <u>Derivative Nature of the RICO Claims</u>

Plaintiff AMD is a Michigan limited partnership and Michigan, like Pennsylvania, has adopted the Revised Uniform Limited Partnership Act (the "RULPA"), which permits a limited partner to bring suit on behalf of the partnership if s/he seeks to assert a right of the limited partnership.  <u>See</u> Mich. Comp. Laws § 449.1101 *et seq.*; Mich. Stat. Ann. § 20.1101 *et seq.*[37] And as Defendants duly note, it is established under Michigan authority "that a shareholder or partner may maintain an individual action only for direct injuries *distinct from* the injuries generally sustained by all shareholders."  Defendants' Reply Brief in Support of Motion for Partial Summary Judgment at 14 (citing, *e.g.*, <u>Michigan Natl'l Bank v. Mudgett</u>, 444 N.W.2d 534, 536 (Mich. App.1989)) (emphasis added).  Indeed, this rule is generally well established.  For while the question of whether a limited partner's suit should be classified as individual or derivative is

---

36.  <u>Cf.</u>  Brief in Opposition to Defendants' Motion for Partial Summary Judgment at 49, n. 10 (noting that if the Court were to "hold that AMD cannot be both the enterprise and the victim, the appropriate course of action" would be to permit Plaintiffs to amend their Complaint and/or their RICO Case Statement to allege their pleading defect).

37.  As Defendants observe, a limited partner is statutorily required to make a demand on the general partners prior to commencing a derivative action.  <u>See</u> § 449.2001 of the Michigan RULPA; Defendants' Memorandum in Opposition at 21. A failure to make a demand is excused, however, where "an effort to cause [the] general partners to bring the action is not likely to succeed."  <u>Id.</u> .  <u>See generally</u>, *e.g.*,  Thomas J. Bamonte, <u>An Assessment of Derivative RICO Actions by Stockholders, Limited Partners and Trust Beneficiaries</u>, 21 Loy. U. Chi. L. J. 153, 158 (1989) (noting that courts "waive the demand requirement . . . when, for example, an obvious conflict of interest . . . exists, or the corporation is under the control of the persons who have committed . . the complained of wrongs").  <u>Cf.</u> Complaint at ¶ 86 (specifically alleging that Plaintiffs made a request and Defendants refused).  In this case, Plaintiffs have alleged that the controlling partners engaged in self-dealing; the futility of further effort to cause them to assert the alleged claims against themselves is apparent.  <u>See</u> <u>Kamen v. Kemper Fin. Serv., Inc.</u>, 500 U.S. 90, 96 (1991)

controlled by the law of the state in which it is organized, the precepts used for such classification spring from the common law and are broadly, uniformly employed.  See Fletcher, Cyclopedia Corporations § 5908-37 (West Perm. Ed.).[38]

As to the MDI Loan Claims, the alleged injury is fundamentally a diminution in the value of the limited partnership interests as a result of MDI's failure to pay appropriate interest on unauthorized loans made from AMD to its managing general partner MDI.  Clearly, such claims may be maintained only as a derivative action on behalf of AMD.

As to the Partnership Interest Claims, Plaintiffs have alleged that they were "injured in their individual capacities because their respective limited partnership interests [were] diluted by Defendants' scheme to acquire limited partnership shares from other unknowing partners using AMD's funds."[39]  And they have asserted that where their injury is a dilution of individual ownership interests, as opposed to a diminution in value of their partnership interests, they have an individual right to recover.  See Plaintiff's Supplemental Brief at 4-5 (citing Lochhead v. Alacano, 697 F.Supp. 406, 411-13 (D. Utah 1988) (citing Alleghany Corp. v. Breswick & Co.,

_____

38.   In addition, the many States to adopt the RULPA look, frequently and appropriately, to their sister States' interpretations and construction.  Cf. McCarthy v. Middle Tenn. Elec. Membership Corp., 466 f.3d 399, 409 (6th Cir. 2006) (noting, in context of direct versus derivative actions, that Delaware "judiciary are recognized as specialists in the field of corporate law" and, therefore, the "Courts of other states consider the decisions of the Delaware courts . . . to be instructive").

39.  Plaintiffs' Supplement Brief in Opposition to Defendants' Motion for Partial Summary Judgment at 3.  Cf. id. ("Since AMD paid for the shares, such shares should have remained in AMD for the benefit of all AMD partners, which would have caused each partner's partnership interest to increase."); id. at 3-4 (asserting that because the Defendants "took the shares for themselves", "[a]ll other partners' ownership interests and profit distributions were wrongfully reduced in varying amounts as a result"); id. at 4 (asserting that the partnership units should have "been properly treated as owned by AMD . . . and profit distributions made accordingly"); id. (concluding that "each wronged partner [therefore] has his/her own individual damage amount which is clearly different from a generalized loss in the value of all of the partners' interests").

353 U.S. 151, 160 (1957));[40] Brief in Opposition to Defendants' Motion for Partial Summary Judgment at 37-38 (asserting that Plaintiffs' ownership shares/percentages in AMD were diluted by Defendants' assignment of additional units to themselves, and that "if Plaintiffs owned a greater portion of AMD, they would have received increased profit distributions"); id. (asserting that such "injury is unique to Plaintiffs and is distinct from any harm to AMD" and that "a limited partner has standing to sue under RICO for *direct personal distributions*")(emphasis in original) (citing Lincoln Nat. Life Ins. Co. v. Silver, 966 F.Supp. 587, 619 (N.D. Ill. 1995)).[41]

_____

40.  In Lochhead, the Utah District Court concluded it appropriate, in the "unique" circumstances of the case, to recognize the minority shareholders' right to a direct action regarding alleged securities fraud as to their entitlement to the issuance of additional shares in the corporation pre-merger.  In assessing the appropriateness of a direct action, the Court observed that the overall value of the corporation was unaffected by the defendant's actions and there was no injury to the corporation at issue.  The case is therefore distinguishable.  See 697 F.Supp. at 411-413.

     To the extent that Plaintiffs continue to assert entitlement to a direct action on the basis of diminished ownership interests and associated decreased profit distributions, the Report disagrees on the basis of case distinctions and review of the case law.  See infra, n. 41 and discussion at pp. 25-30. Cf. Transcript at 60-61 (Plaintiffs' counsel's discussion of the assigned shares, noting that (1) "instead of those units staying with AMD, and thereby accruing to the benefit of everybody, they went right to the Defendants"; (2) AMD's ownership of the limited partnership shares it repurchased was "AMD's for the benefit of all partners, not just the controlling guys.  Indirectly, all remaining limited partners should have benefitted by AMD's increased ownership of the limited partnership units"; and (3) "[w]hat should have happened was all of the profits that were distributed, there should have been a significant amount of additional profits going to everybody else") cf. also id. at 45, 63 and 81 (acknowledging repeatedly that the injury could all be fairly regarded as purely derivative rather than direct).

41.  Like Lochhead, this case is readily distinguishable.  In Lincoln, the District Court held the limited partner could maintain a direct action against the venture capital fund's general partner, where the latter fraudulently obtained individual capital *investments* in addition to his fraud on the partnership.  See 966 F.Supp. 587 (treating recovery for post-investment harm to the partnership as derivative); id. at 610 ("The Court finds that these [wrongful] acts, excepting those representations made to the investors prior to their becoming limited partners, proximately caused [the partnership's] loss of value, an indirect injury to the [partnership's] investors.  However, the Court also finds that [the defendant's misrepresentations] . . . proximately caused

(continued...)

The Report notes that Magistrate Judge Sensenich previously concluded, on consideration of a Motion to Dismiss and where the Partnership Interest Claim included a claimed violation of the Plaintiffs' individual rights to purchase additional partnership interests on the same non-recourse loan terms as the Individual Defendants,[42] that Plaintiffs' individual claims could survive.  See August 2003 Report and Recommendation at 15 (noting, in discussing RICO standing, and without further elaboration/analysis, Plaintiffs allegations "that their ownership share of AMD has been reduced . . . and that Defendants have converted to themselves partnership units in which Plaintiffs have an interest").[43]

Despite Plaintiffs' protestations to the contrary, this conclusion does not, however, prohibit this Court from considering the nature of the Partnership Interest Claims at this stage of the proceedings.  This Court, in adopting the August 2003 Report and Recommendation, did not then decide that Plaintiffs had a triable issue on the merits of an individual claim as to the Partnership Interests; it decided that the violation of a right alleged could give rise to individually cognizable damages, *e.g.*, that an injury to an individual partner's right could be direct as opposed to derivative.  This Court was not then required to, and did not, determine, *e.g.*, whether the

---

41.  (...continued)
 each investors' loss of contributed capital, . . . a direct injury.").

   To the extent that Defendants read Lincoln as supporting an individual, direct action for rights as to profit distributions affected by misappropriations from the partnership, this Report disagrees.  See discussion at text, *infra*, pp. 29-30.

42.  Cf. Plaintiffs' Concise Statement of Material Facts at 25 ("Defendants did not offer the same acquisition opportunities to the other AMD partners."); cf. also *supra* n. 40.

43.  But see id. at 36 (observing, in denying motion to dismiss as to direct claim for conversion, that Plaintiffs had an interest in the partnership units "because potential profits, losses and distributions could be derived" therefrom).

limited partners had established a triable issue of whether they had been defrauded of any such right.

Plaintiffs reiterate most recently and most clearly that the partnership interests repurchased by AMD should have stayed with AMD and that they should now be returned to AMD.[44]  The entitlement to relief claimed, *i.e.*, return of the partnership interests and profits derived, would redound to the benefit of the limited partners in direct proportion to their partnership holdings.[45]  *This* is the *essence* of a derivative claim. See Anglo American Sec. Fund., L.P. v. S.R. Global Internat'l Fund, L.P., 829 A.2d 143, 150 (Del. Ch. 2003)  ("When a plaintiff alleges either an injury that is different from what is suffered by the other shareholders (or partners) or one that involves a contractual right . . . that is independent of the entity's rights, the claim is direct.  If the injury is one that affects all partners proportionally to their *pro rata*

---

44.   See, *e.g.*, Brief in Support of Motion for Partial Summary Judgment at 22-23 ("Defendants must return the shares which they wrongfully acquired from AMD. . . . Defendants must also return the [$6.5M+] in profit distributions derived from the wrongfully acquired shares plus prejudgment interest [with adjustments for subsequent payments]."); Brief in Opposition to Defendants' Motion for Partial Summary Judgment at 39 ("With respect to the claim that Defendants improperly acquired partnership units, Plaintiffs demand the return of the units . . . to AMD, the return of the . . . profit distributions Defendants received on those units . . . [and] Plaintiffs further seek the re-distribution of the profit distributions to the limited partners in accordance with their proportionate ownership percentages following the return of the shares.").

45.  To put it another way, the variation in damage amounts asserted by Plaintiffs results from their various partnership interests.  See *supra* n. 39. See also Defendants' Reply Brief in Support of Motion for Partial Summary Judgment at 15 ("While the amount lost would be unique, the cause of action and injury is not.").  The value of the limited partners' ownership interests in AMD is in their entitlement to profit distributions, and the harm flowing to the limited partners from the Defendant's alleged misappropriation of additional partnership shares belonging to AMD derives therefrom.  Cf. Plaintiffs' RICO Case Statement at 4(a)(ii) (asserting that profit distributions related to converted partnership interests "should have remained for investment in AMD's business and/or to make increased profit distributions to AMD's partners").

interests in the corporation, the claim is derivative.  In a derivative action the plaintiff sues for an injury done to the partnership and any recovery of damages is paid to the partnership.").[46]

Although this Court declined to dismiss Plaintiff's individual claim at the stage of testing the sufficiency of the pleadings, the case has now reached consideration under a summary judgment standard, *i.e.*, the facts have been developed and the parties' theories of the case refined. And Plaintiff's individual claim cannot now survive summary judgment, as the facts establish only a question of violation of AMD's rights, *e.g.*, not to part with valuable assets to a controlling partner for inadequate consideration.[47]

More particularly, the case law is quite clear that in assessing the nature of the claim, the Courts look to the nature of the wrongs alleged. <u>United States v. Acorn Technology Fund, L.P.</u>,

---

46. <u>See also</u> <u>Acorn</u>, 2004 WL 1803321 at *7 (concluding that where alleged harm inflicted by managing partner was to partnership entity, and alleged misconduct damaged limited partners only to the extent of their proportionate interests, injury was indirect and claims derivative).

<u>Cf.</u> <u>NBD Bank, N.A. v. Fulner</u>, 109 F.3d 299, 301 (6th Cir. 1997) ("A shareholder's rights are merely derivative unless he can show violation of a duty owed directly to him."); <u>id.</u> (concluding that action for breach of fiduciary duty was purely derivative); <u>Burden v. Erskine</u>, 401 A.2d 369, 370 (Pa. Super. 1979) ("An injury to a corporation may, to be sure, result in injury to the corporation's stockholders.  Such injury, however, is regarded as 'indirect' and insufficient to give rise to a direct cause of action . . . . ").

47.  Plaintiffs do not, *e.g.*, present any evidence of an individual right under the partnership documents to purchase additional partnership interests on interest-free, non-recourse loan terms. <u>Cf</u> <u>Fox v. Prudent Resources Trust</u>, 382 F.Supp. 81, 89 (D.C. Pa. 1974) (holding that where directors or key officers of corporation issue "stock to themselves for inadequate consideration", corporation is defrauded and derivative suit lies, and applying principle to limited partner).

<u>See generally</u> <u>Hazen v. Modern Food Servs., Inc.</u>, 2004 WL 2320657, *2 (3d Cir. 2004) (holding that law of the case does not apply to District Court's summary judgment analysis as plaintiff may, *e.g.*, then be adjudged to have failed to establish a *prima facie* case even though Court previously concluded, on a motion to dismiss, that the pleading stated a cause of action on its face); <u>id.</u> (noting that the standards used to decide these two very different motions are obviously not the same) (citing <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 278 (3d Cir. 2000)).

2004 WL 1803321 (E.D. Pa. Aug. 12, 2004); see also, e.g., Lipton v. News Int'l Plc., 514 A.2d 1075 (Del. 1986) (noting that the Court must look to the nature of the wrongs alleged and not to a plaintiff's designation or stated intention).  The Courts consider whether the *primary injury* alleged is to the partnership or to the individual plaintiffs.  See, e.g., Whalen v. Carter, 954 F.2d 1087, 1093 (5th Cir. 1992) (holding that limited partners lacked standing to pursue RICO claims because defendants' activity was directed against partnership, and limited partners' injuries were derived therefrom); Anglo American Sec. Fund, L.P. v. S.R. Global Internat'l Fund, L.P., 829 A.2d 143, 150 (Del. Ch. 2003) (observing that the "test looks to the nature of the injury and to the nature of the remedy").  And, as Plaintiffs recognize, they consider whether the harm alleged by the plaintiff is distinct or independent of the harm suffered by the partnership.[48]

Allegations of harm suffered indirectly, through wrongs directed to the partnership, such as malfeasance by the general partners, embezzlement, and/or breach of fiduciary duty, are thus generally regarded as classically derivative, *i.e.*, the types of actions intended to be brought derivatively on behalf of the partnership.  See generally Koster v. American Lumbermen's Mut. Cas. Co., 330 U.S. 518 (1947); Kamen v. Kemper Fin. Serv. Inc., 500 U.S. 90, 95 (1991) (holding that purpose of derivative action is to provide means to protect corporation from misfeasance and malfeasance of "faithless directors and managers").[49]  See, e.g., Strasenburgh v. Straubmuller, 683

_____

48.  See Brief in Opposition to Defendants' Motion for Partial Summary Judgment at 38-39 (asserting that injury was "distinct").  Some Courts, including those in the Sixth Circuit, have described the consideration as whether the individual suffered a "non-incidental injury."  See, e.g., Lochhead, *supra*.

49.  Cf.  Kenworthy v. Hargrove, 855 F.Supp. 101, 106 (E.D. Pa. 1994) (explaining that principles of derivative shareholder suits were extended to limited partnerships); Jaffe v. Harris, 312 N.W.2d 381, 385 (Mich.App. 1981) (recognizing similarity of limited partners and shareholders, and application of general principles of corporate law to determine whether

(continued...)

A.2d 818, 829-30 (N.J. 1996); <u>McCarthy v. Middle Tenn. Elec. Membership Corp.</u>, 466 F.3d 399, 409 (6th Cir. 2006) (noting that claims of mismanagement, self-dealing and breach of fiduciary duty must generally be brought as derivative actions); <u>In re Sunrise Securities Litig.</u>, 916 F.2d 874, 879-80 (3d Cir. 1990) (holding that "gravamen of the complaint" - claims for mismanagement and self-dealing - stated solely derivative injury, *i.e.* injury to entity from which "plaintiffs' losses flowed"); <u>In re Granite Partners, L.P.</u>, 208 B.R. 332, 344 (Bankr. S.D.N.Y. 1997) (same); <u>Lincoln</u>, 966 F. Supp. 587.[50]

   In contrast, where a plaintiff establishes an injury distinct from that suffered by other limited partners, s/he may proceed against the partnership directly; a classic example of such independent harm is interference with the contractual rights of an investor.   See, *e.g.*, <u>U.S. S.B.A. v. Propper</u>, 2004 WL 2624759, *4 (E.D. Pa. Nov. 17, 2004) ("Fraudulent misrepresentation may

---

49.  (...continued)
plaintiffs claims are direct or derivative in nature).

50.  <u>See also</u> <u>Kenworthy</u>, 855 F.Supp.at 106; <u>Partnership Equities Inc. v. Marten</u>, 443 N.E.2d 134, 138 (Mass.App.Ct. 1982) (derivative suit by limited partners proper where acts complained of are mismanagement, negligence, diversion of assets, acts beyond authority, or failure to perform elements of partnership agreement) (cited with approval in <u>Acorn</u>, 2004 WL 1803321 at *4); <u>Blasberg v. Oxbow Power Corp.</u>, 934 F.Supp. 21, 26 (D. Mass. 1996) (holding that allegations of "mismanagement of funds, embezzlement or breach of fiduciary duty" are derivative claims); <u>United States v. Acorn Technology Fund, L.P.</u>, 429 F.3d 438 (3d Cir. 2005) (investor's claims that limited partnership was mismanaged and general partner failed to disclose mismanagement to investors could only be brought in a derivative suit; wrong was to partnership, which suffered as a result of alleged looting by general partner's owner); <u>id.</u> ("noting that "[t]here was no special wrong done to the [individual plaintiffs]" and that the action was "a classic derivative claim under the Revised Uniform Limited Partnership Act"); <u>Caley Investments v. Lowe Family Assocs., Ltd.</u>, 754 P.2d 793, 795 (Colo. Ct. App. 1988) (limited partners lack standing to pursue RICO claims because defendant's activity was directed against partnership, and partners' injuries were derived therefrom); <u>Litman v. Prudential-Bache Properties, Inc.</u>, 611 A.2d 12, 16 (Del. Ch. 1992) (limited partners lack RICO standing).

be brought directly or derivatively.  If the alleged fraud individually induced the investor to enter

into the partnership agreement the claim may be brought directly.  However, if the alleged

fraudulent activity primarily harmed the partnership the claim is derivative.") (citations omitted);

id. (concluding that where fraud in the inducement was not particular to defendants but

constituted a fraud perpetrated against the entire body of limited partners, claims were therefore

derivative).[51]

      As Plaintiffs have established triable issues as to wrongs against AMD and resultant

injuries (a) flowing *pro rata* to its limited partners therefrom and (b) remediable by return of

assets and profits to AMD, the claims before this Court are derivative.

---

51.    See also Lincoln, *supra* n. 41; Acorn, 429 F.3d at 447 (distinguishing fraudulent
inducement claims, which represented a wrong independent of partnership mismanagement and
"separate from any other investor"); Sunrise, 916 F.2d at 883 (distinguishing cases in which
entity's financial condition was directly and personally misrepresented to individual depositor,
and in which "allegations did not link the [wrongful] conduct to injury to the [entity] . . .
generally"); Kenworthy, 855 F.Supp. at 107 & n. 10 (permitting direct  action for fraudulent
misrepresentation claim alleging injury to plaintiffs in their capacity as potential investors, but
holding that claims "resulting from the defendants' alleged improper and unlawful activities
directed against" the partnership could only be maintained in a derivative action); Ceribelli v.
Elghanayan, 990 F.2d 62, 64 (2d Cir. 1993) (concluding that limited partners had no claim for
unique injury as to defendants' alleged improper and unlawful activities directed against
partnership post-investment); In re Sunrise Securities Litig., 916 F.2d 874 (3d Cir. 1990)
(affirming summary judgment in individual depositor's action where injuries were not separate
and distinct from those sustained by institution and other depositors, but flowed only from injury
to S&L and were therefore derivative); id. (distinguishing cases of misrepresentations made to
individuals to induce investment); cases cited *infra* n. 68.  Cf. Blystra v. Fiber Tech Group, Inc.,
407 F.Supp.2d 636 (D.N.J. 2005)  (denying summary judgment to general partner on limited
partner's direct RICO action where limited partnership was *defunct* and there was no risk of
inconsistent results as all limited partners were plaintiffs).  See generally, Thomas J. Bamonte,
An Assessment of Derivative RICO Actions by Stockholders, Limited Partners and Trust
Beneficiaries, 21 Loy. U. Chi. L. J. 153, 158 (1989) (discussing general law of derivative actions
and noting that "a stockholder may maintain and individual action" when he "has sustained a
'special injury'" that is "independent of any duty owed to the corporation" such as when "an
alleged wrong is directed at" their contractual, *e.g.*, voting, rights).

      d.  <u>Issue of Maintenance of Derivitive RICO Claim Where Misappropriations Were</u>

<u>Effected Through Defendants' Control</u>

              i.  <u>The Court's Concerns and the Parties' Responses</u>

      A critical question raised by this Court at oral argument was whether a derivative RICO

mail fraud claim, requiring *underlying fraud* as an element, could be maintained where the

asserted misappropriations of partnership assets were effected not through acts of deceit or

trickery upon AMD but through the Individual Defendants' control.[52]  That is, the RICO claims

appear to rest upon the alleged fraudulent concealment - by misrepresentations to the limited

partners - of misappropriations of partnership assets by controlling general partner(s) who had the

power to effectuate their wrongdoing.  By comparison, Defendants are not, *e.g.*, accused of

inducing Plaintiffs to make additional partnership contributions by these false representations (in

which case, a direct action, and a direct relation between the misrepresentation and the injury,

would lie).  Nor are they accused of obtaining partnership assets by false representations to, or

other acts of deceit against, another individual or entity in control of those assets (in which case

---

52.  <u>See</u> Transcript at 48 (Plaintiffs' counsel acknowledging, in response to the Court's inquiries regarding whether AMD itself must have been deceived for a derivative action, that "[t]he corporation has to have been harmed.  It's a difficult concept when you have . . . when core insiders are committing a fraud."); <u>cf.</u> Plaintiffs' Supplemental Brief at 5 (summarizing, in its concluding words, Defendants' conduct as "improper self-dealing").

      When limited partners sue the limited partnership or its general partners derivatively they are standing in the shoes of the partnership to vindicate its rights.  <u>See</u> <u>U.S.S.B.A. v. Propper</u>, 2004 WL 2624759 (E.D. Pa. Nov. 17, 2004) (noting that the derivative "form of the lawsuit does not obscure its substance: it is the *partnership's* rights, not the limited partner's, that the lawsuit seeks to vindicate") (quoting <u>Bankston v. Burch</u>, 27 F.3d 164, 167 (5th Cir. 1994)) (emphasis in original).

the fraudulent misrepresentations would be clearly instrumental to the accomplishment of the taking).[53]

The Defendants are accused of purloining, in breach of their duties under the partnership agreement(s) and related statutory and common law, partnership assets via improper use of their control and abuse of their fiduciary authority.  But is such "constructive fraud", or fraud without deception/misrepresentation, sufficient to underlie a RICO mail fraud claim?

The Defendants are also accused of concealing their misappropriations by omission and/or misrepresentation in correspondence to the limited partners, thus tolling the statute of limitations on related claims.[54]  But what is the new injury to which this correspondence fraud was instrumental; that is, what is the reliance injury resulting from this non-disclosure or concealment where the loans were issued and the partnership interests transferred by the power of the controlling general partner(s)?  Where the misappropriations were protracted and ongoing as opposed to once-and-done, where, *e.g.*, the Defendants are accused of utilizing AMD as MDI's bank, concealment from the limited partners was perhaps instrumental to Defendants' continued perpetration of further misappropriations over the years.[55]  Even so, however, can the

---

53.  Compare Kenworthy, *supra* n. 51; Lincoln, *supra* n. 41 (cited in Plaintiff's Supplemental Brief in Opposition at n. 3) (RICO case in which venture capital fund general partner lied to bank to misappropriate assets, and lied to limited partners to induce their capital investments in partnership, and was charged with SEC violations, mail fraud, and other wrongs); In re Brown, *infra* n. 59.

54.  See Rotella v. Wood, 528 U.S. 549, 561 (2000); Forbes v. Eagleson, 228 F.3d 471, 486 (3d Cir. 2000).

55.  See Plaintiffs' Second Supplemental Brief in Opposition to Defendants' Motion for Partial Summary Judgment (asserting that the "schemes by their very nature included contemporaneous fraudulent concealment by mail as an essential component, since discovery by the other partners would stop the schemes in their tracks"); Tabas v. Tabas, 47 F.3d 1280 (3d Cir. 1995) (*en banc*);

(continued...)

misrepresentations to the limited partners themselves give rise to a *derivative* RICO mail fraud claim absent reliance by AMD?[56]

In response to the Court's questions regarding the requisite element aspects of a RICO mail fraud, Defendants largely repeat their "separate entity" argument, which appears non-responsive.  See Defendants' Supplemental Brief in Support of Motion for Partial Summary Judgment.

And Plaintiffs point primarily to Michigan and Pennsylvania law on the imputation of knowledge.  See Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion for Partial Summary Judgment (asserting that "their [sic] can be no imputation of Defendants' knowledge of [their self-dealing and breaches of fiduciary duty] to AMD or its limited partners").  But to address whether a partnership or corporate entity should be charged with knowledge of a partner or officer's wrongdoing for purposes of ascribing liability to that entity or barring it from recovery against the partner/officer is *not* to address whether the entity has been "defrauded"

_____

55.  (...continued)
 discussion *infra* at pp. 35-38.

56.  In general, and under the Uniform Limited Partnership Act in particular, limited partners, in exchange for limitations on liability (*e.g.*, they are not bound by the obligations of the partnership) and retention of  favorable tax treatment, surrender their right to participate in the conduct of the partnership.  See, *e.g.*, In re Estate of Hall, 535 A.2d 47, 56 (1987) (noting that limited partners "must abstain from participation in the conduct of the business").

   The Report notes that it might be argued that AMD *did itself* rely on Defendants' misrepresentations because it is, in some aspects, identified with the limited partners.  That is, while a limited partnership acts only through its general partner(s) as to business matters, on matters regarding evaluation of the performance and/or fidelity of a general partner and potential replacement, the partnership may act through its limited partners despite their otherwise circumscribed role.  No directly-related analysis has come to hand during the Courts' research and, in view of the Report's recommendations as to the RICO questions before it, the Court need not reach this alternative argument.

under RICO.[57]  In other words, it need not reach the core question of common-law fraud and

reliance.[58]  Not everyone who is unknowing was deceived.

The difficult question raised by the RICO action presently before this Court is whether a

RICO mail fraud claim may be maintained for derivative injuries where the controlling/general

partners' misappropriations were in breach of their partnership obligations but were not

effectuated by a deception practiced upon the partnership.  Maintenance of this action appears to

require that either (a) the controlling partners' breach of a fiduciary duty of loyalty and/or breach

of a fiduciary obligation to disclose self-dealing constitutes a "fraud" on the partnership

---

57.  Cf. Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion for Partial Summary
Judgment at 2 n. 1 (citing § 449.12 of the Michigan Compiled Laws, providing that knowledge
or notice of a partner is charged to the partnership except "in the case of a fraud on the
partnership committed by or with the consent of that partner").

58.  Plaintiffs cite to In re Brown, 342 F.3d 620, 630 (6th Cir. 2003), in which the Sixth Circuit
held that a partnership was not barred from recovering against a general partner who
misappropriated partnership monies in the control of an account manager; and to In re Phar-Mor,
Inc. Sec. Litig., 900 F.Supp. 784, 786 (W.D. Pa. 1995), a particularly ponderous litigation long
before this Court, in which Judge Zeigler held that the corporation was not barred from recovery
against its corporate officers.  See Plaintiffs' Supplemental Brief in Opposition to Defendants'
Motion for Partial Summary Judgment at 2-3 & n. 1.  Neither of these opinions involved RICO
claims.  Moreover, it should be noted that, in Brown, the jury - in considering breach of contract
and tort claims - found no "fraud" but rather breach of contract against the account manager who
disbursed funds outside the scope of his authority.  It should also perhaps be noted that, in Phar-
Mor, Judge Zeigler observed that "one of the elements of a fraud claim" is "reliance on the truth
of the fraudulent misrepresentation."  900 F.Supp. at 786.

Compare Bank of China v. NBM, LLC, 359 F.3d 171 (2d Cir. 2004) (concluding that bank
could not reasonably rely on borrower's fraudulent misrepresentations, and so could not
establish bank fraud predicate offense under RICO, where offices were aware of activities,
unless actions exhibited total abandonment of bank's interests).  This Report accepts the
principle that an entity is not charged with an unfaithful fiduciary's knowledge of his own
infidelity.  However, such principle does not answer the question of deception.  Rather, the entity
must have made a decision based on a tortuously-induced false state of knowledge, i.e., have
acted upon a mistaken belief.  In this case, AMD's knowledge or lack thereof was irrelevant
because the controlling/managing partners did things they had the power to do.

cognizable under RICO's mail fraud provisions (*i.e.*, that civil RICO mail fraud is co-extensive with "constructive" fraud and no deception-reliance is required), or (b) sufficient reliance is met where ongoing partnership misappropriations are effectuated not only by the managing/general partners' control, but also by concealment via misrepresentations to/reliance thereon by the limited partners (*i.e.*, the deception-reliance need not be against-by the plaintiff partnership if other circumstances suffice for proximate cause).  But, as noted *supra*, neither the Third Circuit nor the Supreme Court has reached a determination of these questions.[59]

In portions of their pleadings more directly pertinent to these issues, Plaintiffs cite repeatedly to the Third Circuit's plurality, *en banc* decision in <u>Tabas v. Tabas</u>.[60]  In <u>Tabas</u>, two brothers were co-partners under a partnership agreement providing that, on the occasion of one's death, the survivor would provide partnership management services at no charge/with no reduction to the fifty percent (50%) income distribution due to the deceased partner's surviving spouse.  At issue were allegations that the survivor took personal management fees and other monies/benefits from the partnership, and otherwise fraudulently misrepresented partnership expenditures.  The issue expressly before the Circuit Court was whether the facts alleged reflected

───────────────

59.  In <u>Anza</u>, the District Court dismissed the RICO mail fraud claim for failure to allege the plaintiff's reliance on the asserted fraud.  The Second Circuit reversed, concluding that the plaintiff could adequately allege proximate cause "even where the scheme depended on fraudulent communications directed to and relied on by a third party rather than the plaintiff." 373 F.3d 251, 263 (2nd Cir. 2004).  Although the Supreme Court vacated and remanded, it did so on the basis of insufficient "directness" under <u>Holmes</u>, without reaching the reliance question.  <u>See</u> 126 S.Ct. at 1997 (discussing remoteness and "attenuated [causal] connection" between plaintiff's injury and defendant's conduct); *supra* n. 5.

60.  47 F.3d 1280 (3d Cir.), *cert. denied*, 515 U.S. 1118 (1995).

the continuity necessary to satisfy RICO's "pattern of racketeering activity" requirement.[61]  Judge

Roth, writing for a 7-6 majority, held that sufficient "continuity" was met where the survivor's

misconduct continued for over three (3) years and a threat of continuing or open-ended fraudulent

conduct existed.  In so holding, she also discussed other elements of RICO mail fraud, including

lulling letters.[62]  It is, however, unclear whether Judge Roth's opinion in this plurality decision

might be read to suggest that, unlike common law fraud, § 1341 does not incorporate an element

of deception-reliance, so that the surviving and controlling brother's misappropriations from the

partnership themselves constituted an underlying RICO fraud.   Rather, the language of that

opinion suggests that Judge Roth - and the five (5) members of the thirteen (13) member *en banc*

Court to join that portion of her opinion - understood the requisite reliance to occur because the

reduced monthly distribution checks issued to his brother's widow constituted misrepresentation

by the surviving brother, prevented discovery of the misappropriations, and so facilitated on-

going misconduct.  See, e.g., 47 F.3d at 1294, n. 18 (opining that "it is clear that the mailings

_____

61.  See 47 F.3d at 1281 ("Specifically, we must determine what showing is required for
plaintiffs to meet the 'continuity' prong of RICO's 'pattern' requirement.").

62.  The seven-member majority on the continuity question at issue before the *en banc* court was
comprised of (1) Judge Roth, and the two Judges joining all portions of her opinion; (2) Judge
Becker, concurring and joining *portions* of Judge Roth's discussion of other elements of RICO
mail fraud (Sections IV(A-C), but not IV(D)), and the two Judges joining his concurrence; and
(3) Judge Alito, who joined in the holding, but expressly declined to join *any* portion of Judge
Roth's consideration of other elements.  The majority opinion carried, therefore, only six (6) of
the thirteen (13) Judges as to Sections IV(A-C) and only three of the *en banc* Court as to Section
IV(D).  For these reasons, many of Plaintiff's extensive citations to the language of Section IV of
Tabas as *holdings* of the Third Circuit are misplaced.

    Cf. Tabas, 47 F.3d at 1302 (Greensberg, J., dissenting) (objecting to the "alchemy" of
transforming a state-law dispute "over the proper allocation of a partnership's profits into a
federal RICO case simply by alleging that the defendants used the United States mail to
communicate").  Five other members of the *en banc* Court joined Judge Greensberg's dissent.

were incident to an essential part of the scheme [where h]ad the defendants failed to mail disbursement checks to plaintiffs, plaintiffs would have been immediately alerted"); id. (concluding that the monthly disbursements delayed discovery and enabled the scheme to continue).[63]   The Report is, however, unable to fully discern the parameters of underlying fraud and lulling letter doctrine reflected in this reading.[64]   Two things *are* clear: (1) the case, proceeding as a direct action by the victim surviving spouse, to whom the misrepresentations were made, and who was deprived of her express entitlement to an equal division of the income, is importantly distinguishable from this derivative action;[65] and (2) as discussed, *supra*, Tabas is a

---

63.  See also Korman v. Trusthouse Forte, P.C., 1990 WL 83353 (E.D. Pa. June 15,1990) (concluding, with regard to private placement memorandum, that mailings that conceal ongoing mismanagement through misrepresentations constitute a "predicate act of fraud"); Dana Corp. v. Blue Cross & Blue Shield Mut. of Northern Ohio, 900 F.2d 882, 885 (6th Cir. 1990) (finding employer sufficiently alleged mail fraud because routine mailings misled over time as to true state of affairs).   Cf. Kann v. United States, 323 U.S. at 96 (Douglas, J., dissenting) (discussing a "continuing venture" in which "[t]he use of the mails was crucial to the total success of the fraudulent project" and admonishing that the Court was not "justified in chopping up . . . the scheme into segments and isolating one part from the others"); United States v. Maze, 414 U.S. 395, 414-15 (1974) (White, J., dissenting) (citing prior opinions in which the Court held that § 1341 reached "'cases where the use of the mails is a means of concealment so that further frauds which are part of the scheme may be perpetrated'") (quoting Kann v. United States, 323 U.S. at 94-95)).

64.  See *supra* text at n. 29 (discussing lulling letter jurisprudence).  Cf. John J. Lulejian, Making Sense of the Kaleidoscope of Patterns, 69 Temple L. Rev. 413, 442-43 (Spring 1996) (noting that because the Tabas Court "could not agree on a rationale", it confused rather than clarified "the law of civil RICO").

65.  Cf. Liss v. Liss, 2002 WL 576510 (Pa.Com.Pl. March 22, 2002) (distinguishing, in permitting direct action, general rules as to corporate derivative actions and wrongs between two fifty-percent shareholders in a close corporation).

plurality opinion deciding a question of continuity under RICO, and without a majority as to that

portion (Section IV) which opines on some of the aspects of mail fraud at issue *sub judice*.[66]

      ii.  <u>The Report's Subsequent Research and Conclusion</u>

     The Court has, therefore, extensively reviewed the case law of this and other Circuits, as

well as voluminous scholarly commentary, in making its recommendation.  It has, over the course

of several months since oral argument, identified no factually analogous case in any federal court,

*i.e.*, a derivative action for RICO mail fraud maintained on behalf of a limited partnership against

misappropriating/self-dealing, controlling partners, addressing this question.[67]  It has found many

RICO cases distinguishable as direct actions in which a misappropriation was effectuated by a

deception practiced upon, and reliance by, the victim-plaintiff.[68]  And the case law is replete with

instances of similar facts brought on breach of fiduciary duty, breach of contract, fraudulent or

---

66.  <u>Compare</u> Plaintiff's Second Supplemental Brief in Opposition at 2 (describing <u>Tabas</u> as "a case on all fours with this case").

67.  <u>Cf.</u> Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion for Partial Summary Judgment at 3 ("Plaintiffs have found no RICO cases which *discuss* the precise issue articulated by the Court.") (emphasis in original).

68.  The Report notes in particular the Eastern District Court's decision in <u>Gubitosi v. Zegeye</u>, 28 F.Supp.2d 298 (E.D. Pa. 1998), in which investors in an MRI limited partnership sued the shareholders of the general partner which sold them their interest, alleging that the defendants had thereafter used the plaintiffs' funds to purchase the MRI equipment in their own names.  The <u>Gubitosi</u> plaintiffs alleged RICO securities fraud violations.

    See also, *e.g.*, <u>Tiernan v. Devoe</u>, 923 F.2d 1024 (3d Cir. 1991) (addressing RICO claims raised by limited partners against general partners for misrepresentations of financial prospects and tax benefits of real estate venture entered into); <u>In re Merrill Lynch Ltd. P'ships Litig.</u>, 154 F.3d 56, 59 (2d Cir. 1998) (holding investors injured when they purchased overpriced limited partnership units based on fraudulent misrepresentations).  <u>Cf.</u> <u>Lundy v. Hochberg</u>, 79 Fed. App'x 503 (3d Cir. 2003) (RICO action brought against former law partner alleging violation of mail fraud statute in inducement to enter into partnership); <u>United States v. Hevener</u>, 2006 WL 3707833 (3d Cir. Dec. 18, 2006) (upholding criminal mail fraud conviction in Ponzi scheme where lulling letters were sent to victims who had relied on fraudulent investment advice).

negligent misrepresentation, and similar non-RICO bases. But the Report finds it must address the "substantial question" of reliance in this unique context; seek an analytical basis for resolution, if possible, of the apparent conflict in Circuit law; infer as best it may from prior writings how the Third Circuit might consider the issue(s); and venture its conclusion as to the just application of the law in the case at hand.

As recently tallied by our Sister Court in the Eastern District of Pennsylvania,[69] and by the Anza Petitioners' able counsel in their Brief before the Supreme Court,[70] the majority of Circuit Courts to consider the question have held that the plaintiff's reliance and resultant injury are essential to a civil RICO claim predicated on mail fraud (hereafter, the "majority position").[71] More specifically, the Second, Fourth, Fifth, Sixth, Eighth and Eleventh Circuits have so held. See Bank of China v. NBM LLC, 359 F.3d 171, 176 (2d Cir. 2004), cert. dismissed 126 S.Ct. 675

---

69. See Walter v. Palisades Collection, LLC, 2007 WL 959043 (E.D. Pa. March 28, 2007).

70. See Brief for Petitioners in Anza, 2006 WL 139200.

71. It is well accepted that a common law action for fraud , whether by misrepresentation or omission, requires reliance by the plaintiff. See, e.g., W. Page Keeton, et al., Prosser & Keeton on the Law of Torts at 728 (5th ed. 1984); Ming v. Woolfolk, 166 U.S. 599, 602-03 (1886) (citing cases and history); Black's Law Dictionary 788 (4th ed. 1951) (defining fraud as "intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing"); Restatement (Second) of Torts, § 525 (1977).

And the Supreme Court has repeatedly confirmed that RICO should be interpreted in light of settled common law principles. See, e.g., Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters, 459 U.S. 519, 533-34 (1983) (looking to common law torts and "ordinary principles of law" in construing statute); Holmes, 503 U.S. at 266 (calling for the use of common law analogies); Beck v. Prupis, 529 U.S. 494 (2000) (turning to the common law of civil conspiracy). See also Field v. Mans, 516 U.S. 59, 69-70 (1995) (noting that the "court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of . . . terms [settled under the common law]"). Cf. Renolds v. East Dyer Dev. Co., 882 F.2d 1249, 1253 (7th Cir. 1989) (observing that not all unethical conduct is fraud within RICO and that "civil RICO is a statutory tort").

(2005) (holding that <u>Holmes</u> proximate cause requirement applies to all civil RICO fraud actions and "therefore" to prevail plaintiff must establish its reasonable reliance on defendant's purported misrepresentations or omissions);[72] <u>Chisolm v. TranSouth Fin. Corp.</u>, 95 F.3d 331, 337 (4th Cir. 1996) (holding that plaintiff's justifiable reliance is required "where fraud is alleged as a proximate cause of the injury" to ensure compliance with <u>Holmes</u> and "the existence of a 'direct relation between the injury asserted and the injurious conduct alleged'");[73] <u>Summit Props. Inc. v. Hoechst Celanese Corp.</u>, 214 F.3d 556, 558-60 (5th Cir. 2000) (noting that "[m]ost other circuits" require plaintiff's detrimental reliance for civil RICO fraud, and imposing a "general requirement" of reliance as consistent with <u>Holmes</u>' requirement of proximate causation);[74] <u>Cent. Distribs. of Beer, Inc. v. Conn.</u>, 5 F.3d 181, 184 (6th Cir. 1993) (noting deception/fraud "element of mial fraud" and requiring, "therefore", evidence of misrepresentations/omissions to the

---

72.  <u>See also</u> <u>id.</u> (distinguishing between requirements of criminal and civil RICO fraud).  <u>But see</u> <u>Anza v. Ideal Steel Supply Corp.</u>, 373 F.3d 251 (2d Cir. 2004) (acknowledging that a civil RICO plaintiff alleging violations of the mail fraud statute must show reliance, but concluding that fraud on and reliance by a third party suffices where plaintiff was an intended victim/target of a mail fraud), *vacated and remanded on other grounds*, 126 S.Ct. 1991; *supra* n. 5.

73.  <u>Id.</u> (distinguishing between criminal and civil RICO, and holding that a fraud predicate for the latter must be "classic" fraud, requiring plaintiff's justifiable and detrimental reliance on defendant's material misrepresentation); <u>see also</u> <u>Brandenburg v. Seidel</u>, 859 F.2d 1179, 1188 (4th Cir. 1988) (concluding that "detrimental reliance by the victim . . . is necessary to establish injury . . . 'by reason' of a predicate act of mail fraud within the meaning of § 1964(c)").

74.  <u>But cf.</u> <u>id.</u> at 561, n. 21 (suggesting an exception if plaintiff was the "target" of the fraud) (citing <u>Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.</u>, 18 F.3d 260, 263-64 (4th Cir. 1994)).  In <u>Summit Properties</u>, Judge Higginbotham expressly recognized the Fifth Circuit's prior conclusion that "reliance is not an element of the underlying offense of mail fraud", and distinguished it from the question of "whether a plaintiff's reliance . . . is necessary in order to establish proximate causation."  214 F.3d at 558-59 (citing <u>Armco Industries Credit Corp. v. SLT Warehouse Co.</u>, 782 F.2d 475 (5th Cir. 1986)).

plaintiff and evidence of plaintiff's detrimental reliance) (citations omitted);[75] Appletree Square I
Ltd. P'ship v. W.R. Grace & Co., 29 F.3d 1283, 1286 (8th Cir. 1994) (noting that RICO fraud
requires evidence of detrimental reliance by the plaintiff) (citing to Holmes, and cases of the
Second, Fourth and Seventh Circuits;[76] Sikes v. Teleline, Inc., 281 F.3d 1350, 1360-61 (11th Cir.
2002) (holding that the requirements of civil RICO mail fraud are (1) that the defendant
intentionally participated, (2) in a scheme to defraud, (3) the plaintiff of money or property, (4) by
means of material misrepresentations, (5) using the mails or wires, (6) that the plaintiff relied on a
misrepresentation made in furtherance of the fraudulent scheme, (7) such misrepresentation
would have been relied upon by a reasonable person, (8) plaintiff suffered injury as a result of the
reliance, and (9) plaintiff incurred a specifiable amount of damages) (cited with approval in
Walter v. Palisades Collection, LLC, 2007 WL 959043 (E.D. Pa.  Mar. 28, 2007)).[77]  In addition,

---

75.  See id. (noting that "defendant must make a false statement or omission of fact *to the plaintiff*") (emphasis in original); id. (concluding that the mail fraud "must involve misrepresentations . . . flowing from the defendant to the plaintiff" and "[a]lthough a general fraudulent scheme which incidentally affects a person may support other civil claims against the wrongdoer, the victim cannot assert a RICO claim absent evidence that the defendant made [misrepresentations] to the victim").  See also Vandenbroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 701 (6th Cir. 2000) (RICO fraud requires showing of plaintiff's reliance on a material misrepresentation); Gould, Inc. v. Mitsui Min. & Smelting Co. Ltd., 750 F.Supp. 838 (N.D. Ohio 1990) (opining that it is clear "at least in [the 6th] Circuit, that in order to state a claim" for mail fraud the allegations must include plaintiff's reliance on a misrepresentation or omission).

76.  Compare United States v. Blumeyer, 114 F.3d 758, 767-68 (8th Cir. 1997) (considering whether a criminal defendant may be convicted of mail fraud for making misrepresentations only to persons other than the intended property-theft victims, compiling cases on this "difficult question" that "does not admit of easy reconciliation" and concluding that he may).  See discussion at text of Circuit Court's distinctions between the requirements of criminal and civil RICO.

77.  Id. at 1361 (noting that the District Court properly recognized that reliance is a "necessary element" of RICO fraud).  See also Pelletier v. Zweifel, 921 F.2d 1465, 1499 (11th Cir. 1991)
(continued...)

the Seventh Circuit has similarly regarded this matter.  See Matter of EDC, Inc., 930 F.3d 1275,

1280 (7th Cir. 1991) (stating that civil RICO plaintiffs could complain only of misrepresentations

made to them and on which they reasonably relied).[78]  But see Israel Travel Advisory Serv., Inc.

v. Israel Identity Tours, Inc., 61 F.3d 1250, 1258 (7th Cir. 1995) (concluding that competitor's

claim based on misrepresentations to potential customers could satisfy Holmes' proximate cause

test, yet affirming dismissal because competitor was outside RICO mail fraud statute's intended

scope of protection); id. discussed infra at n. 82.

    In contrast, a few Courts (and one Supreme Court Justice) have expressly concluded that

reliance by the plaintiff is not required because RICO mail fraud, unlike common law fraud,

contains no reliance requirement (hereafter, the "minority position").  These opinions conclude

that, in RICO fraud, reliance is purely a way to show proximate causation and, as such, may

sometimes be dispensed with.  See Systems Management, Inc. v. Loiselle, 303 F.3d 100, 104 (1st

Cir. 2002) (concluding that RICO "bases its own brand of civil liability on the commission of

specified criminal acts" and "criminal fraud under the federal statute does not require 'reliance'

---

77.  (...continued)
 (noting that mail fraud contains a reliance requirement "just like common law fraud").

78.  In Matter of EDC, Judge Posner addressed litigation by the unsecured creditors of a group of
bankrupt affiliates against the seller of a steel corporation, for damages related to the entities'
assumption of vested pension benefits.  Plaintiffs asserted a conspiracy designed to de-fraud the
Pension Benefit Guaranty Corporation (the "PBGC") into permitting sale of the steel corporation
by disguising (via a leveraged buy-out) the likelihood of the purchasers' subsequent inability to
meet the vested benefit obligations.  That is, plaintiffs alleged the defendant was "shucking" the
vested benefits through a scheme designed to escape liability.  Judge Posner, writing for the
Seventh Circuit, held that liability for fraud could be extended to a plaintiff other than the
"primary" victim (i.e., the PBGC) and, in doing so, observed that a general limitation of liability
for fraud to the "intended victim" simply serves as a shortcut for a "reasonable reliance" inquiry.
See 930 F.2d at 1279-1281.  Compare discussion of third-party litigation and reliance, infra.

by anyone: it is enough that the defendant sought to deceive");[79] <u>Grider v. Keystone Health Plan Central, Inc.</u>, 2006 WL 3825178 (E.D. Pa. Dec. 20, 2006). This position, which has been criticized as "'unmoor[ing]' [fraud] from its common law meaning",[80] is adopted by Justice Thomas in his lengthy dissent in <u>Anza</u>. <u>See</u> 126 S.Ct. at 2007 (Thomas, J., dissenting) (considering "whether reliance is a required element of a RICO claim predicated on mail . . fraud and, if it is, whether that reliance must be by the plaintiff"); <u>id.</u> at 2007-09 (concluding that "the mere fact that the predicate acts underlying a particular RICO violation happen to be fraud offenses does not mean that reliance, an element of common-law fraud, is also incorporated as an element of a civil RICO claim", and distinguishing between a requirement of proximate cause, under <u>Holmes</u>, justified by the "very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover", and reliance, "a specialized condition [of] common law fraud").[81]

_____

79. The First Circuit goes on to reason that, while it assumes Congress intended to require proximate cause:

> proximate cause - largely a proxy for foreseeability - is not only a general condition of civil liability at common law but is almost essential to shape and delimit a rational remedy: otherwise the chain of causation could be endless. By contrast, reliance is a specialized condition that happens to have grown up with common law fraud. Reliance is doubtless the most obvious way in which fraud can cause harm, but it is not the only way.

303 F.3d at 103-04.

   <u>Cf.</u> <u>Ideal Steel Supply Corp. v. Anza</u>, 373 F.3d 251, (2d Cir. 2004) (concluding that plaintiff can bring mail fraud-based RICO claim where scheme depends on fraudulent communications directed to and relied on by third party).

80. Brief for Petitioners in <u>Anza</u>, 2006 WL 139200, *30 (quoting <u>Neder</u>, 527 U.S. at 23-24).

81. Justice Thomas significantly premises his conclusion that no element of reliance is required on the Supreme Court's prior decision in <u>Neder v. United States</u>, 527 U.S. 1 (1999). In this

(continued...)

44

This Report concludes from the above readings that the majority position, *i.e.*, that reliance by the plaintiff is required to state a claim for RICO mail fraud, has two analytical predicates: (1) that RICO fraud requires, as at common law, a misrepresentational deception (*i.e.*, that it is not co-extensive with "constructive fraud"); and (2) that, as a logical inference, the plaintiff cannot have been injured by the defendant's misrepresentation absent reliance.[82]

---

81.  (...continued)
criminal case, the Court held that the criminal mail fraud statutes "did not incorporate all the elements of common-law fraud", pointed specifically to "justifiable reliance", explained that the fraud statutes prohibited even a "scheme to defraud" not just a completed crime, and determined that requiring proof that the victim relied and suffered actual damages "would clearly be inconsistent with" that statute.  527 U.S. at 24-25.

Cf. Brief for Petitioners in Anza, 126 S.Ct. 713, 2006 WL 139200, *28 (explaining that, in contrast to the criminal statute interpreted in Neder, the provision at issue in Anza creates a private cause of action for damages "by reason of" the criminal violation, and that nothing in Neder suggests that requiring proof of reliance in civil actions, as requisite to establishing proximate damages, would be inconsistent with statute) (quoting Neder, 527 U.S. at 25 ("[c]ivilly of course the [mail fraud statute] would fail without proof of damage, but that has no application to criminal liability") (quoting United States v. Rose, 56 F.2d 747, 749 (2d Cir. 1932)).  Several of the Circuit Courts to address the issue have made a similarly careful distinction between criminal and civil RICO fraud.  See, e.g., supra at nn. 72-74 (noting such distinction in cases of the Second, Fourth and Fifth Circuits).

82.  The Report notes that what has been characterized as the Circuits' majority position breaks down upon a critical fault line, *i.e.*, there is no clear majority for the express proposition that RICO incorporates, as a requisite *element*, the deception-reliance of common law fraud.  Cf. discussion of J. Thomas' dissent in Anza, *supra* n. 81.  To the contrary, as reflected in the parentheticals and footnotes provided *supra*, the language of several cases in the majority suggests that those Courts' decisions were driven by their proximate cause analysis.  See *supra* at 39-41 (citing cases from the Second, Fourth and Fifth Circuits which strongly reflect a proximate-cause-based requirement of detrimental reliance); *supra* at 41-42 (citing cases from the Seventh and Eight Circuits which also lend themselves to this interpretation).  See also Israel Travel, 61 F.3d at 1257 (rejecting, without discussion of Matter of EDC, requirement that plaintiff rely on misrepresentation as equivalent to the conclusion that a derivative injury is never cognizable under RICO) (citing Mid Atlantic Telecom, Inc. v. Long Distance Servs., Inc., 18 F.3d 260 (4th Cir. 1994)).  Cf. Anza, 126 S.Ct. at 1996 (interpreting RICO's "by reason of" requirement to mean that the defendant's RICO violation must be the proximate cause of the plaintiff's injury) (citing Holmes); id. at 2008 (Thomas, J., dissenting) ("[T]he fact that proof of
(continued...)

In considering the majority's first predicate, as a threshold matter, the Report notes several cases in the fiduciary context (a doctrinal line distinct from those third-party reliance cases in which the majority opinion arose) suggesting that RICO fraud may *be* co-extensive with constructive fraud, *i.e.*, that self-dealing in breach of fiduciary obligations is itself sufficient.

Judge Posner has propounded, in discussing the parameters of RICO mail fraud, that "fraud, in its elementary common law sense of deceit, includes deliberate concealment of material information in a setting of fiduciary obligation."  United States v. Dial, 757 F.2d. 163, 168 (7th Cir. 1985) (concluding that judge convicted of mail fraud breached his fiduciary duty to the public when he concealed solicitation of loans from counsel).  More recently, in United States v. McNally, the Supreme Court concluded that the words "to defraud" in the mail fraud statute have the "common understanding" of "wronging one in his property rights by dishonest methods or

---

82.  (...continued)
reliance is often used to prove an element of the plaintiff's cause of action, such as the element of causation, does not transform reliance itself into an element of the cause of action."). Compare *supra* at 40-42 (citing cases from the Sixth and Eleventh Circuits which more clearly incorporate a common law fraud *element* of misrepresentation/reliance).

   Similarly, the related decisions by our Sister Court in the Eastern District have been described as requiring a showing of reliance *either* as an element of mail fraud violation *or* as a necessary condition of proximate causation. See Walter, 2007 WL 959043, *8 (providing citations to six decisions by three other Judges); Grider, 2006 WL 3825178, *20 n. 48 (identifying additional Eastern and Middle District Pennsylvania cases requiring plaintiff's reliance for RICO fraud).

   In so concluding, the Report concurs with the recent assessment of Judge Robreno in the Eastern District of Pennsylvania.  As Judge Robreno explained: "The majority view stems from the Supreme Court's decision in Holmes that a RICO plaintiff must show that his injury was proximately caused by the defendant's misrepresentations.  The thinking is, as a matter of simple logic, if a plaintiff did not rely on the defendant's misrepresentations, his injury could not have been proximately caused by them."  Walter, 2007 WL 959043, *7.  See also id. at *8 (quoting the Solicitor General's Brief for the United States as Amicus Curiae Supporting Respondents in Bank of China, 2005 WL 2875061, *8 ("It is a matter of basic logic that a misrepresentation cannot cause, much less proximately cause, injury, unless someone relies upon it.")).

46

schemes" and "usually signify the deprivation of something of value by trick, deceit, chicane or

*overreaching*." 483 U.S. 350, 358 (1987), *superceded by statute as stated in* United States v.

Stoneman, 870 F.2d 102 (3d Cir. 1989), (quoting Hammerschmidt v. United States, 265 U.S. 182,

188 (1924)) (emphasis added).[83]  Similarly, in its very next term, the Court held that "[t]he

concept of 'fraud' includes the act of embezzlement, which is "'the fraudulent appropriation to

one's own use of the money or goods entrusted to one's care by another.'" Carpenter v. United

States, 484 U.S. 19, 27 (1987) (quoting Grin v. Shine, 187 U.S. 181, 189 (1902)).  See also id.

(affirming convictions for RICO mail fraud where newspaper's financial reporter participated in

insider trading scheme by advance use of information analyzed/discussed in reporter's stock

market columns and holding that employee violated fiduciary duty not to exploit employer's

property, *e.g.*, stock information, for his own benefit while "pretending to perform his duty to

safeguard it"); id. at 27-28 ("It is well established, as a general proposition, that a person who

acquires special knowledge or information by virtue of a confidential or fiduciary relationship

with another is not free to exploit that knowledge or information for his own personal benefit but

---

83.  In McNally the Court was addressing the criminal conviction of a former Kentucky
governmental official for RICO mail fraud related to "kick-backs" from insurance entities
awarded State contracts.  As noted above, the Court adopted its definition of fraud as
encompassing "overrreaching" from Hammerschmidt, a criminal case which also involved a
breach of fiduciary duty against the government and in which the Court made clear that its
definition was based on fiduciary principles.  See Hammerschmidt, 265 U.S. at 188 (concluding
that to "conspire to defraud" the United State government, for purposes of the criminal statute
there at issue, required only that "its legitimate official action and purpose . . . be defeated by
misrepresentation, chicane, or the overreaching of those charged with carrying out the
governmental intention").  The Supreme Court's decision in McNally  is duly noted in Plaintiff's
Second Supplemental Brief in Opposition at 2, n. 1.  See also Kehr Packages, Inc. v. Fidelcor,
Inc., 926 F.2d 1406, 1415 (3d Cir. 1991) (quoting McNally, and "assum[ing] without deciding"
that complaint sufficiently alleged scheme to defraud in violation of mail fraud statute on basis
of actionable misrepresentations); but see id. at 1417 (stating that mail fraud statute's
"condemnation of a 'scheme or artifice to defraud' implicates only plans calculated to deceive")
(quoting United States v. Kreimer, 609 F.2d 126, 128 (5th Cir. 1980)).

must account to his principal for any profits derived therefrom.") (quoting <u>Diamond v. Oreamuno</u>, 24 N.Y.2d 494, 497 (1969)).[84]  <u>See also</u> <u>Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc.</u>, 1992 WL 97826, *6 (E.D. Pa. April 30, 1992) (stating that, although labeling cannot transform theft or conversion into fraud, "abuse of a confidential relationship" can) (citing <u>Carpenter</u>, <i>supra</i>).

        Similar principles of fiduciary duty are, of course, applicable in the partnership context <i>sub judice</i>.  <u>See, <i>e.g.</i></u>, <u>Haydinger v. Freedman</u>, 2000 WL 748055, *8 (E.D. Pa. June 8, 2000) (explaining that the general partner of a limited partnership owes the fiduciary duty of loyalty); <u>id.</u> ("Every partner must account to the partnership for any benefit and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with . . . the conduct . . . of the partnership or use by him of its property.") (quoting 15 Pa.C.S. § 8334);  <u>Band v. Livonia Assocs.</u>, 439 N.W.2d 285, 293 (Mich. App. 1989) (same); <i>supra</i> at p. 12.[85]  Thus, these cases can be read to suggest that Defendant's surreptitious takings of loans and

---

84.  It should be noted that, in <u>Carpenter</u>, publication of the column was essential to fruition of the insider-trading scheme, so that the employer's contemporaneous and affirmative reliance on the employee's deception was required.

85.  <u>Cf.</u> <u>In re Estate of Mihm</u>, 497 A.2d 612, 615 (Pa. Super. 1985) (finding duty arising from confidential relationship under Pennsylvania law where "one of the parties is bound to act with the utmost good faith for the benefit of the other party and can take no advantage to himself from his acts relating to the interest of the other party").  <u>Cf. also</u> Brief of Petitioners in <u>Anza</u>, 126 S.Ct. 713, 2006 WL 139200, *33-34 (discussing cases permitting recovery where relying parties were agents, or otherwise "acting on behalf of, the plaintiff and the fraudulent transaction was still directly connected to the plaintiff's injury"); <u>id.</u> (complaining that the Second Circuit's <u>Anza</u> rule was not confined to narrow plaintiff-reliance exceptions appropriate to the common-law principles underlying fraud-based civil RICO actions); <u>McNally v. United States</u>, 483 U.S. 350, 370 (1987) (Stevens, J., dissenting) (citing historic legal dictionary definitions of fraud as "to withhold from another that which is justly due him").

        <u>But see</u> <u>In re Sunrise Securities Litig.</u>, 916 F.2d 874, 882-84 (3d Cir. 1990)(describing self-
                                                                    (continued...)

partnership interests comprised the requisite *underlying* fraud (*i.e.*, no deception or

misrepresentation is required), and that their "lulling" correspondence misrepresentations to the

limited partners, as an essential component of their ongoing scheme, completed their RICO mail

fraud.[86]

---

85.  (...continued)
dealing by officers/directors of failed savings and loan - such as undisclosed personal loans, inadequately secured loans, diversion of funds for other purposes, and other deceptive operating practices - as "mismanagement and wrongdoing"and granting summary judgment on RICO claims brought as direct action); id. at 883 ("The asserted injury emanated from mismanagement, not fraud.");  United States v. Acorn, 2004 WL 1803321, *2- 3 (E.D. Pa. Aug. 12, 2004) (discussing (1) "fraud" against the limited partners regarding direct action as to their investments; and (2) "mismanagement" and "breach of fiduciary duty" regarding derivative action, where allegations against managing partner included prohibited transactions, irregularities, failure to disclose improper practices in the operating reports, failure to act in good faith, misapplication of funds, unauthorized and excessive management fees, and improper cash advances).

86.  See G. Robert Blakey and Kevin P. Roddy, Reflections on *Reves v. Ernst & Young*, Its Meaning and Impact on Substantive, Accessory, Aiding, Abetting and Conspiracy Liablity Under RICO, 33 Am. Cr. L. R. 1345 (1996).  In this more than 400 page article, Professor Blakey, the author of RICO, asserts that mail fraud is not and should not be limited to common law "deceit" or "larceny by trick", and that a much broader range of over-reaching conduct was intended by Congress.  Id. at 1583.  His position is expressly that RICO's reference to a "scheme to defraud" is not limited to forms of common law deceit but that, *e.g.*, "cheating . . . suffices to establish a scheme to defraud even without false pretenses or representations."  But cf. United States v. Greenleaf, 692 F.2d 182, 188 (1ˢᵗ Cir. 1982) (concluding that "breach of a fiduciary duty, *standing alone*, does not constitute mail fraud") (cited with emphasis added in McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1ˢᵗ Cir. 1990) (affirming dismissal of RICO mail fraud claim by competing travel agency where defendant's deceptions against regulatory agencies may have had an adverse impact on plaintiff, but competitor was not object and was not deceived); id. (finding, at bottom, insufficient causal connection).

     Also cf. generally, Hilder v. Dexter (House of Lords 1902), App. Cas. 474, 477 (Earl of Halsbury) ("[T]he worst person to construe [a statute] is the person who [was] responsible for its drafting.  He is very much disposed to confuse what he intended to do with the effect of the language which in fact has been employed."); Matter of EDC, 930 F.2d 1275, 1281 (7ᵗʰ Cir. 1991) (Posner, J.) (cautioning against the hyperbolically-broad interpretations of "fraud" and "extravagant rhetoric in which some judicial opinions interpreting the federal mail fraud . . .

(continued...)

This Court need not, however, adopt a constructive fraud reading of RICO to recognize AMD's right to proceed in this case. For it may hold to the Circuit majority's deception-detrimental reliance paradigm while acknowledging the significance of the parties' fiduciary relationship to the possibility of proximate cause not predicated on the *plaintiff's* reliance.

Although the Supreme Court in <u>Anza</u> found the causal link between the competitor's alleged injury and the defendant's fraud on the State too attenuated,[87] the distinction is apparent when the parties are in a fiduciary relationship and the *cestui que trust* is the target of the self-dealing scheme.[88] None of the Circuit cases concluding that the plaintiff's reliance is required as a logical necessity involved misrepresentations to a closely-related third party. And indeed, this appears to be just the situation anticipated in the alternative position, for the causal relationship may be established by the Defendants' concealment of its misappropriations from those in the best position to protect the partnership from the Defendants' self-dealing.[89]

---

86. (...continued)
statutes come wrapped")

87. <u>Anza</u>, 126 S.Ct. at 1997-98 (identifying the "central question" as "whether the alleged violation led directly to the plaintiff's injuries"). <u>Cf.</u> <u>Holmes</u>, 503 U.S. at 268 (concluding that, to meet proximate cause requirement, plaintiff must allege "some direct relation between the injury asserted and the injurious conduct alleged").

88. <u>Cf.</u> <u>Ideal Steel Supply Corp. v. Anza</u>, 373 F.3d 251 (2d Cir. 2004), *vacated and remanded on other grounds*, 126 S.Ct. 713 (2006) (holding that reliance by third party suffices where plaintiff was an intended victim/target); <u>Summit Props. Inc. v. Hoechst Celanese Corp.</u>, 214 F.3d 556, 560-62 (5th Cir. 2000) (suggesting an exception to requirement of detrimental reliance by plaintiff where plaintiff was the target of the fraud).

89. <u>See</u> <u>Walter</u>, 2007 WL 959043, *7 ("The issue becomes whether, in a RICO action predicated on a mail . . fraud violation, a defendant's alleged RICO violation and the plaintiff's injuries can be directly related if the plaintiff did not rely to his detriment on the violation."); <u>Systems Management, Inc. v. Loiselle</u>, 303 F.3d 100, 104 (1st Cir. 2002) ("Reliance is doubtless the most obvious way in which fraud can cause harm, but it is not the only way."); <u>Anza</u>, 126
(continued...)

reason

In so concluding, the Report notes that the consideration of proximate cause necessarily entails a question of policy, *i.e.*, at what point should the line of legal responsibility be drawn.[90] Because it is clearly not logically impossible to be harmed by misrepresentations to a third party by whom the plaintiff might otherwise be protected, the plaintiff's reliance should not be made a talisman. Rather, the Report concludes that where the parties' close relationship makes the plaintiff's injury foreseeable, an exception to a general requirement of plaintiff's reliance is appropriate as a matter of justness. And it believes a sound basis for distinction exists between a defendant who had no prior responsibility where the incidental injury lay (*i.e.*, in <u>Anza</u>, with the

---

89. (...continued)

S.Ct. at 2007 (Thomas, J., dissent) (asking whether, if reliance is required, it must be by the plaintiff); <u>United States v. Christopher</u>, 142 F.3d 46, 53-54 (1st Cir. 1998) (noting that "the deception must in fact cause the loss" but finding "[n]othing in the mail . . . fraud statute requir[ing] that the party deprived of money or property be the same party who is actually deceived"); <u>id.</u> at 54 (hypothesizing a scheme to mislead someone in a protective position would fall with civil mail fraud despite non-reliance by the property-loss victim).

   <u>Cf.</u> <u>Holmes</u>, 503 U.S. at 269-70 (reasoning that the "requirement of a direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims").

90. <u>See</u> <u>Summit Props. Inc. v. Hoechst Celanese Corp.</u>, 214 F.3d 556, 562 (5th Cir. 2000) ("[W]hen civil RICO damages are sought for injuries resulting from fraud, a general requirement of reliance by the plaintiff is a commonsense liability limitation."); <u>Anza</u>, 126 S.Ct. at 2000 (Thomas, J., dissenting) (quoting <u>Holmes</u> as holding that "the term 'proximate cause' [is employed] to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts" and that such tools reflect "ideas of what justice demands, or of what is administratively possible and convenient") (quoting <u>Holmes</u>, 503 U.S. at 268) (quoting Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984)); <u>Gregory v. United States</u>, 253 F.2d 104, 109 (5th Cir. 1958) (scheme to defraud, as a legal concept, is judged as a reflection of "moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society").

competitor) and a defendant with a fiduciary duty and *a priori* responsibility for assets held in trust.[91]

Similarly, the Report recognizes and shares the grave concerns expressed by several Justices of the Supreme Court, many Federal Courts, and a six-member minority of the Third Circuit *en banc* in Tabas, that RICO not be interpreted so broadly as to federalize "garden variety business disputes."[92]  It concludes, nonetheless, that Congress' specification of the elements of "fraud" and "use of the mail" in the predicate act at issue, while perhaps counseling against a recognition of an action based solely on constructive fraud,[93] does not counsel against recognition of an action where fraudulent concealments and/or misrepresentations made to and relied upon by the limited partners facilitated a long-term, on-going scheme of misappropriation and self-dealing by the controlling/general partner(s). And it concludes, after careful review of the volumes of

---

91.  Cf. McNally, 483 U.S. at 372 (Stevens, J., dissenting) (opining, in discussing the appropriate definition of "fraud", that the "wide open spaces in statutes such as [the mail fraud statute] are most appropriately interpreted as implicit delegations of authority to the courts to fill in the gaps in the common-law tradition of case-by-case adjudication").  Compare V-Tech Services, Inc. v. Street, 2007 WL 397405 (3d Cir. Feb. 6, 2007) (affirming dismissal of complaint for RICO fraud by minority-owned contractor alleging injury by defendant's fraud on government regarding use of disadvantaged subcontractors).  In this most recent decision, the Third Circuit held, in accordance with Anza, that plaintiff could not demonstrate proximate causation because the "direct victim" of defendant's fraud was the government entities.  Id. at *2.

92.  See Tabas, 47 F.3d at 1302 (Greenburg, J., dissenting).  Cf. Summit Properties, 214 F.3d 556, 562 (5th Cir. 2000).  See also Sedima, 473 U.S. at 501 (Marshall, J., dissenting) (opinioning with dissatisfaction that the majority's interpretation of the civil RICO statute "validate[d] the federalization of broad areas of state common law of frauds"); Justice William H. Rehnquist, Remarks of the Chief Justice, 21 St. Mary's L.J. 5, 13 (1989) (suggesting that "the time has arrived for Congress to enact amendments to civil RICO to limit its scope to the sort of wrongs that are connected to organized crime, or have some other reason for being in federal court").

93.  Cf. Systems Management, 303 F.3d at 104 (recognizing "some surface incongruity" in allowing a civil RICO plaintiff to recover for fraudulent acts even though the same plaintiff could not (for lack of reliance) recover for fraud at common law).

material presented in connection with the parties' motions, that the circumstances of this case, when considered in the context of the "fraud" and "reliance" analyses employed by the Federal Courts, establish an issue of civil RICO mail fraud that should be submitted to trial for resolution.[94]

### III.  **CONCLUSION**

For the reasons set forth above, it is respectfully recommended that Plaintiff Salvatore's Motion for Partial Summary Judgment on his claim for breach of fiduciary duty be denied.  It is further respectfully recommended that the Defendants' Motion for Partial Summary Judgment be denied.  And it is respectfully recommended that Plaintiffs be granted leave to amend, within twenty (20) days of entry of the Order on these Motions, their pleading to allege a § 1962(c) enterprise distinct from the alleged victim, AMD.

In accordance with the Magistrate Judges Act, 28 U.S.C.  § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

---

94.  Cf. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1417 (3d Cir. 1991) ("We emphasize that the responsibility for determining the factual sufficiency of fraud allegations remains with the fact-finder.").

LISA PUPO LENIHAN
United States Magistrate Judge

Dated: May 22, 2007

cc:    Honorable Terrence F. McVerry
       United States District Judge

       All Counsel of Record

54