IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANGELA B. WEAVER and DOMENICK )
SALVATORE, individually and derivatively, )
as limited partners, on behalf of )
AMD SOUTHFIELD MICHIGAN )
LIMITED PARTNERSHIP, a Michigan )
Limited Partnership, )
                                              Plaintiffs, )
                v. )       Civil Action No. 02-1719

MOBILE DIAGNOSTECH, INC., a Pennsylvania )
Corporation, MDX CORPORATION, a )
Pennsylvania Corporation, A. JEROME )
DIGIACOBBE, JR., CALVIN F. ZONTINE )
and ALPHA MEDICAL CONSULTANTS, )
INC., a Pennsylvania Corporation )
                                              Defendants. )
                v. )

ANGELA B. WEAVER, Executrix of the Estate )
of Gerald W. Weaver, Deceased, )
                                    Additional Defendant. )

## MEMORANDUM ORDER

Presently before the Court for consideration are the following pretrial motions:

JOINT MOTION OF PLAINTIFFS ANGELA WEAVER AND DOMENICK SALVATORE AND ADDITIONAL DEFENDANT ANGELA WEAVER TO BIFURCATE THE TRIAL OF THE THIRD PARTY CLAIMS AND COUNTERCLAIMS (Document No. 269);

DEFENDANTS' MOTION IN LIMINE TO ADMIT DEFENSE OF BUSINESS JUDGMENT RULE (Document No. 272);

ADDITIONAL DEFENDANT, ANGELA B. WEAVER, EXECUTRIX OF THE ESTATE OF GERALD W. WEAVER, DECEASED, MOTION IN LIMINE TO PRECLUDE DEFENDANTS/THIRD PARTY PLAINTIFFS FROM TESTIFYING OR OFFERING TESTIMONY AS TO ANY MATTERS OCCURRING BEFORE THE DEATH OF GERALD W. WEAVER (Document No. 274);

PLAINTIFFS' OMNIBUS MOTION IN LIMINE (Document No. 275);

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY (Document No. 276);

PLAINTIFFS' MOTION FOR SANCTIONS PRECLUDING DEFENDANTS' EXPERT TESTIMONY (Document No. 288);

PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE EVIDENCE NEWLY IDENTIFIED IN DEFENDANTS' SUPPLEMENTAL PRETRIAL STATEMENT (Document No. 289); and

DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE EVIDENCE IDENTIFIED IN DEFENDANTS' SUPPLEMENTAL PRETRIAL STATEMENT, AND STRIKE PLAINITFFS' MOTION FOR SANCTIONS (Document No. 301).

The motions have been thoroughly briefed and are ripe for disposition.

1. Motion to Bifurcate Trial

Plaintiffs seek to bifurcate the trial of the claims and counterclaims between Defendants and Angela Weaver in her role as Executrix of the Estate of Gerald W. Weaver (the "Estate") (collectively, the "Third Party Claims") from the trial of Plaintiffs' derivative claims against Defendants on behalf of AMD Southfield Limited Partnership ("AMD"). Plaintiffs cite the follwing reasons: (1) the Third Party Claims will be moot if the Allegheny County Orphan's Court determines that the Estate should remain closed; (2) the Dead Man's Act will preclude certain evidence as to the Third Party Claims but will not preclude such evidence as to the derivative claims such that it will be "impossible" for the same jury to hear both sets of claims; (3) the general complexity of the matters at issue; (4) the existence of additional defenses that will be raised by the Executrix if the Estate is reopened; and (5) the lack of prejudice to Defendants, as they will be able to "put on relevant evidence relating to their affirmative defenses."

Defendants do not directly address the pros and cons of bifurcation. Instead, Defendants primarily disagree with Plaintiffs' recitation of the procedural history of the case (both retrospective and prospective) and contend that the state court's ruling regarding the Dead Man's Act is not "law of the case" or entitled to preclusive effect. Defendants do argue that bifurcation is not warranted solely due to complexity or jury confusion and suggest that the court has an "array of methods" to deal with such complexity, such as a limiting instruction to the jury regarding evidentiary issues.

The applicable law concerning bifurcation was recently summarized in *Grosek v. Panther Transp., Inc.*, 2009 WL 905035 (M.D. Pa. April 1, 2009) (citations omitted):

> The decision to bifurcate . . . is left to the trial court's discretion and must be decided on a case by case basis. In exercising our discretion, we "must weigh the various considerations of convenience, prejudice to the parties, expedition, and economy of resources." The moving party bears the burden of establishing that bifurcation is appropriate.

The Court is convinced that bifurcation is appropriate in this case. The Court is aware that separate trials (if necessary) would be more expensive and time-consuming than a single proceeding. On the other hand, judicial economy would not be furthered by trying claims and counterclaims regarding an Estate that the Orphan's Court may decline to reopen. The Executrix intends to raise further defenses in that court if the Estate is reopened, while the derivative claims are ready for trial immediately - nearly seven years after Plaintiffs filed this case. Moreover, the Court does not share Defendants' confidence that a jury could readily separate the derivative claims from the Third Party Claims if they were tried together, particularly if certain evidence is admitted for only limited purpose(s). One of the "array of methods" available to the Court to deal with such evidentiary and legal complexity is bifurcation. *See* Fed. R. Civ. P. 42(b).

Accordingly, the JOINT MOTION OF PLAINTIFFS ANGELA WEAVER AND DOMENICK SALVATORE AND ADDITIONAL DEFENDANT ANGELA WEAVER TO BIFURCATE THE TRIAL OF THE THIRD PARTY CLAIMS AND COUNTERCLAIMS (Document No. 269) is **GRANTED**. The trial of the derivative claims shall proceed as scheduled. The trial of the Third Party Claims shall be continued pending further order of Court.

2. Business Judgment Rule Defense

Defendants have filed a motion in limine seeking an affirmative declaration that they should be entitled to present arguments and jury instructions regarding their defense of the "business judgment rule" ("BJR"). Plaintiffs oppose this motion and, as part of Plaintiffs' Omnibus Motion in Limine, seek to preclude the BJR as a defense.

The BJR, in essence, insulates certain corporate business decisions from second-guessing in hindsight in a lawsuit. In *Cuker v. Mikalauskas*, 692 A.2d 1042, 1046 (Pa. 1997), the

Pennsylvania Supreme Court explained (citations omitted) (emphasis added):

> Courts recognize that managers have both better information and better incentives than they. The press of market forces ... will more effectively serve the interests of all participants than will an error-prone judicial process." The business judgment rule "expresses a sensible policy of judicial noninterference with business decisions ***made in circumstances free from serious conflicts of interest between management, which makes the decisions, and the corporation's shareholders***. Not only do businessmen know more about business than judges do, but competition in the product and labor markets and in the market for corporate control provides sufficient punishment for businessmen who commit more than their share of business mistakes." "The fact is that liability is rarely imposed upon corporate directors or officers simply for bad judgment and this reluctance to impose liability for unsuccessful business decisions has been doctrinally labeled the business judgment rule." Shareholders challenging the wisdom of a business decision taken by management must overcome the business judgment rule. "For efficiency reasons, corporate decisionmakers should be permitted to act decisively and with relative freedom from a judge's or jury's subsequent second-guessing. It is desirable to encourage directors and officers to enter new markets, develop new products, innovate, and take other business risks.

The BJR doctrine is not all-encompassing. For example, it does not protect corporate decisionmakers against allegations of fraud or self-dealing, or decisions beyond the scope of authority, and the decisionmakers must have exercised reasonable diligence and honestly and rationally believed that their decisions were in the best interests of the company. *Id.* at 1048.

Plaintiffs reason that the BJR defense cannot be asserted by Defendants under the facts and circumstances of this case because: (1) this case involves a limited partnership while the BJR defense is limited to corporations; (2) the BJR defense cannot override the plain and unambiguous language in the partnership agreement that prohibited the general partner and/or its affiliates from taking out loans from AMD; and (3) the BJR defense does not apply to self-dealing transactions.

The Court generally agrees with Plaintiffs, although it notes the split of authority as to whether the BJR defense applies outside the corporate context. Under Pennsylvania and Michigan law, however, the BJR defense has been applied only in corporate law. *See, e.g. In re Consumers Power Co. Derivative Litigation*, 132 F.R.D. 455, 465 (E.D. Mich. 1990) (investors seeking the ability to challenge and review business decisions should choose the organizational form of a general partnership as opposed to a corporation). In *Henkels & McCoy, Inc. v. Adochio*, 138 F.3d 491 (3d Cir. 1998), the Court of Appeals for the Third Circuit noted: "the business judgment rule

also is inapposite in the partnership context because it is a function of the unique corporate setting." *Id.* at 502 (*citing* 3A William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations §§ 1036-37 (perm. ed. rev.vol.1994)). Even assuming arguendo that the BJR defense could apply to limited partnerships, it would not apply in this case. As its name implies, the BJR defense applies to the "judgment" and "wisdom" involved in operating a business and cannot be used to justify a breach of a clear contractual obligation set forth in the partnership agreement. *See Roper v. Thomas*, 298 S.E.2d 424, 428-29 (N.C. Ct. App. 1982) and the other cases cited in Plaintiffs' Response Brief at 3. This Court has previously ruled that the AMD partnership agreement prohibition on taking loans was clear and unambiguous. Moreover, the BJR defense does not apply in the factual context of this case because the transactions at issue constituted self-dealing and conflicts of interest, as Defendants are alleged to have taken over $5.75 million in unauthorized loans from AMD for themselves personally to the detriment of the other partners. Defendants have wholly failed to rebut the self-dealing rationale, which is explicit in *Cuker*. *See American Society for Testing & Materials v. Corrpro Companies, Inc.,* 478 F.3d 557, 571 (3d Cir. 2007). In addition, the BJR defense would be subject to exclusion under Fed. R. Evid. 403.

Accordingly, DEFENDANTS' MOTION IN LIMINE TO ADMIT DEFENSE OF BUSINESS JUDGMENT RULE (Document No. 272) is **DENIED** and the corresponding portion of PLAINTIFFS' OMNIBUS MOTION IN LIMINE (Document No. 275) is **GRANTED**.

       3.      Dead Man's Act

The Executrix seeks to preclude testimony as to matters occurring during the life of her deceased husband, Gerald Weaver. The derivative Plaintiffs do not join in this motion. Indeed, in a rare display of unanimity, all sides agree that the Dead Man's Act does not preclude evidence of

events which occurred prior to Gerald Weaver's death with respect to the derivative claims.[1] In light of the Court's decision to bifurcate the trial, there is no need to decide the motion at this time. To be clear, Ms. Weaver's participation as a Plaintiff in the "purely derivative claims" brought on behalf of AMD will not jeopardize her ability to re-assert the Dead Man's Act if and when an appropriate time arises.

Accordingly, ADDITIONAL DEFENDANT, ANGELA B. WEAVER, EXECUTRIX OF THE ESTATE OF GERALD W. WEAVER, DECEASED, MOTION IN LIMINE TO PRECLUDE DEFENDANTS/THIRD PARTY PLAINTIFFS FROM TESTIFYING OR OFFERING TESTIMONY AS TO ANY MATTERS OCCURRING BEFORE THE DEATH OF GERALD W. WEAVER (Document No. 274) is **DENIED WITHOUT PREJUDICE**.

4.     Plaintiffs' Omnibus Motion

Plaintiffs seek pretrial rulings on the following additional evidentiary issues: (1) that the Court has already ruled that §11.11 of the AMD partnership agreement clearly and unambiguously prohibits loans to the general partner and/or its affiliates such that Defendants may not present evidence or argument that the agreement is ambiguous or that they were permitted to take loans; (2) that the Court has already ruled that Defendants DiGiacobbe and Zontine controlled AMD, Mobile Diagnostics, Inc. ("MDI"), MDX Corporation ("MDX"), and Alpha Medical Consultants, Inc. ("Alpha"); (3) that Defendants be precluded from advocating a "reliance on the advice of counsel" defense; (4) that Defendants be precluded from offering evidence that Gerald Weaver was a lawyer; (5) that any testimony regarding what Gerald Weaver said to Defendants be precluded as hearsay and/or as irrelevant; and (6) that the testimony of Gerald Weaver, II be precluded as hearsay and/or as irrelevant.

---

[1] The Court will discuss below whether such testimony is or is not admissible on other grounds.

A. Law of the Case

The parties will not be permitted to re-argue or contradict rulings that have been previously made by the Court. Thus, Defendants will be precluded from contending that they were authorized to take loans under the partnership agreement, as the Court has expressly rejected this argument. Memorandum Order of June 25, 2007 at 5; Report and Recommendation of May 22, 2007 at 10 ("the Partnership Agreement at issue contains a clear and express prohibition against such loans, and the general language cited by the Defendants is insufficient to overcome it."). In sum, the specific prohibition on loans in the Partnership Agreement is clear and unambiguous and therefore, evidence or argument that other provisions of the Partnership Agreement may have allowed Defendants to act with unfettered discretion with respect to other partnership affairs is not relevant to that issue.

Similarly, Defendants will be precluded from arguing that they lacked control over AMD, MDI, MDX, or Alpha during the relevant time period. Defendants may introduce the actual facts regarding the ownership interest(s) of Gerald Weaver in the various entities, but as this Court previously ruled, "Defendants' assertions as to Gerald Weaver's *influence* on their decision-making do not alter the clear record regarding Defendants' ownership interests in, and control and management of, the entities at issue." Memorandum Order at 5 (emphasis in original).

B. "Reliance on Advice of Counsel" Defense

Defendants will be precluded from advocating a "reliance on the advice of counsel" defense based on alleged advice provided by Gerald Weaver, as it is not applicable under the factual context of this case.[2] For the defense to apply, the reliance must be reasonable and in good faith. *In re Estate of Geiger*, 2000 WL 33522360 *4 (Mich. Ct. App. 2000). Even if a fiduciary acts reasonably, the defense would not prevent liability for a mistake of law. *Id.* In this case, the "reliance on advice of counsel" would not justify Defendants' actions in breaching the clear and

---

[2]The Court notes that the alleged advice at issue was oral and apparently not documented or verifiable in any way whatsoever. Plaintiffs' hearsay objection will be addressed below.

7

unambiguous prohibition against taking loans. Moreover, the Court notes that the verbal, undocumented nature of the alleged advice further undercuts the reasonableness of Defendants' reliance. *See, e.g. United States v. McRee*, 7 F.3d 976, 983 (11th Cir. 1993).

Even more fundamentally, the "reliance on counsel" defense is premised on obtaining the advice of an independent, disinterested attorney. *Thompson v. Glenmede Trust Co.*, 1994 WL 683378 *3 (E.D. Pa. 1994); *Larami Corp. v. Amron*, 1995 WL 128022 *7 n.12 (E.D. Pa. 1995). In *Arthur Lipper Corp. v. Securities and Exchange Commission*, 547 F.2d 171 (2d Cir.1976), the Court rejected the "reliance on counsel" defense because the attorney was also counsel for the corporation whose transactions were being challenged and explained that while information from the corporation's attorney could be obtained since he was familiar with the situation, that information should have been evaluated and filtered through an independent attorney before the broker-dealer could reasonably rely upon it. *Accord Sorrell v. SEC,* 679 F.2d 1323, 1327 (9th Cir. 1982) (one may not rely on attorney's advice when attorney is an interested party). It is apparent that Gerald Weaver was not an independent attorney, but was a board member and 25% shareholder/owner of MDI. Indeed, Defendants contend that he had the most to lose if MDI did not obtain a loan. Thus, Defendants cannot cite alleged legal advice from Gerald Weaver as a basis for a "reliance on counsel" defense. Because Defendants cannot establish an appropriate legal basis for a "reliance on counsel" defense, the relevance of such evidence would be substantially outweighed by the danger that it would confuse the issues and mislead the jury, and therefore, would be subject to exclusion under Fed. R. Evid. 403.[3]

Plaintiffs seek to go another step and preclude Defendants from introducing the mere fact that Gerald Weaver was an attorney. This request will be denied. Given the exclusion of the "reliance on counsel" defense, it will not be unduly prejudicial for the jury to understand the basic facts regarding Weaver's education and training and roles within the entities involved in this case.

---

[3]Nor may Defendants introduce such testimony through their alleged admissions. For similar reasons, Defendants may not advance a "reliance on co-partner" defense.

8

C.  Hearsay-Related Objections

Plaintiffs raise a number of hearsay objections. Defendants contend that various exceptions to the hearsay rule may apply. It is somewhat difficult for the Court to resolve all such issues without the benefit of context and the evidentiary record developed at trial. At this juncture, the Court will outline certain principles in an effort to aid the parties' trial preparation.

i.  Statements Against Interest

In order for the "statement against interest" hearsay exception in Fed. R. Evid. 804(b)(3) to apply, the proffered statement must be "so far contrary to the declarant's pecuniary or proprietary interest," at the time of its making, that a reasonable person would not have made the statement unless he believed it to be true. A hearsay statement by Gerald Weaver to the effect that it was lawful to take the loans at issue would not have been sufficiently contrary to his pecuniary or proprietary interest at the time it was allegedly made to be admissible.

ii.  Admissions by a Party Opponent

In light of the bifurcation of claims by and against the Estate, statements by Gerald Weaver may not be offered into evidence as "admissions by a party-opponent" against the Estate. However, Defendants contend that statements by Gerald Weaver are admissible pursuant to Fed. R. Evid. 801(d)(2)(d) as admissions by a party opponent because he acted as an agent of the AMD partnership as general counsel, officer and director. Plaintiffs did not respond directly to this argument. Statements made by an agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, may be admissible under the plain text of Fed. R. Evid. 801(d)(2)(D) if AMD is considered to be a "party opponent."

In *Savarese v. Agriss*, 883 F.2d 1194 (3d Cir. 1989), the Court of Appeals for the Third Circuit explained that no guarantee of trustworthiness is necessary for an admission under Rule 801(d)(2) and that the Advisory Committee recommends generous standards of admissibility under that Rule. *Savarese* involved a statement by the defendant entity's chairman, who was deceased.

9

The Court held that a deceased party's statement will be admissible under Fed.R.Evid. 801(d)(2), explaining: "[i]f the statement is that of a party, offered by his opponent, it comes in as an admission [under Rule 801(d)(2)] and there is no occasion to inquire whether it is against interest, this not being a condition precedent to admissibility of admissions by opponents." Finally, the Court concluded:

> we note that several courts have held that a statement by a declarant, deceased at the time of trial, may be admissible under the vicarious admission provision in Fed.R.Evid. 801(d)(2)(D). *See, e.g., Pino v. Protection Maritime Ins. Co.*, 599 F.2d 10, 13 (1st Cir.), cert. denied, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979); *Cedeck v. Hamiltonian Fed. Sav. & Loan Ass'n.*, 551 F.2d 1136, 1138 (8th Cir.1977). We believe the better view is that the fact of the declarant's death impacts on the weight of the evidence rather than its admissibility. See J. Wigmore, Wigmore on Evidence §§ 1055, 1056 at 23 (1972) (acknowledging in a subheading entitled, "Weight of Admissions," that "there is a general distrust of testimony reporting any extrajudicial oral statements alleged to have been made, including a party's admissions.")

Neither party has cited any authority regarding the unique context of "admissions" by a Plaintiff-entity in a derivative action. The only cases or scholarly commentary located by the Court which discuss Fed. R. Evid. 801(d)(2)(D) in the context of derivative actions involved statements offered against a defendant. Because the theory underlying a derivative action is that the officer-defendants breached their fiduciary duty to the Plaintiff-entity, it would be incongruous to deem the statements of the allegedly breaching officers to be "admissions" of the party opponent entity. The plain text of Rule 801(d)(2) and the holding in *Savarese* appear to make some such statements admissible. However, statements made in furtherance of the Defendants' alleged breaches of the partnership agreement and/or their fiduciary duties would seem to be, per se, beyond the scope of the agency or employment. As the proponent of such evidence, it will be Defendants' burden to show that Gerald Weaver's statements were made in his capacity as AMD's agent or servant, concerned a matter within the scope of the agency or employment, and were made during the existence of the relationship. *Lippay v. Christos*, 996 F.2d 1490, 1497 (3d Cir. 1993).

In any event, certain statements by Gerald Weaver, for example, as to the legality of taking

10

the subject loans, will be inadmissible for the reasons set forth above. As explained in 5 *Weinstein's Federal Evidence* § 801.32[3]: "Rule 801(d)(2) deals only with the hearsay problem that would otherwise be created by the use of party admissions. Party statements must still comply with other evidence rules, such as Rules 402 and 403."

       iii. Testimony of Gerald Weaver, II

As to Gerald Weaver, II, the Court is unable to decide at this juncture whether the entirety of his testimony would be admissible or not. Testimony regarding the statute of limitations or laches would not be relevant in this trial, as the Court has determined that those defenses are moot because the claims are wholly derivative. To the extent that Gerald Weaver, II, would testify as to out-of-court statements made by his deceased father, Gerald Weaver, such statements are subject to exclusion as hearsay and for the other reasons set forth above. The Court is hard-pressed to grasp how the statements set forth on page 16 of Defendants' brief (regarding Gerald Weaver, II's inexact awareness of his father's affiliations with Defendants) would be admissible under Fed. R. Evid. 401 and 403. However, the Court must reserve final judgment until trial.

In accordance with the foregoing, PLAINTIFFS' OMNIBUS MOTION IN LIMINE (Document No. 275) is **GRANTED IN PART AND DENIED IN PART**.

 5. <u>Motion to Exclude Plaintiff's Expert</u>

Defendants seek to foreclose Plaintiffs from calling Bryan F. DiLucente, CPA, as an expert witness, contending that: (1) his testimony will not assist the jury to understand the evidence or determine any factual issues; (2) his opinion is not supported by reliable methodology; and (3) he has an inherent conflict of interest, namely that he was engaged by DiGiacobbe and Zontine in 1994 to perform an expert valuation of the ownership interest they held, through MDI, in Oncotech, Inc. and in the "Colkitt litigation" matter in the Pennsylvania state courts.

A. Methodology Challenges

The Court can deal summarily with Defendants' first two arguments. Federal Rule of Evidence 702 provides that if scientific, technical, "or other specialized knowledge" will assist the factfinder, "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise...." While forensic accounting is not susceptible to many of the specific methodological factors discussed in *Daubert v. Merrill Dow Pharms. Inc.*, 509 U.S. 579 (1993) and *Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000), such expert testimony falls comfortably within the parameters of Rule 702. *See, e.g., United States v. Llera Plaza*, 188 F. Supp.2d 549, 563-64 (E.D. Pa. 2002) (recognizing that accountants have specialized technical knowledge although they are not part of a "scientific community"). In this case, DiLucente's education, knowledge, training and experience may be helpful to the factfinder in determining damages. There is an adequate "fit" between his testimony and Plaintiffs' contentions. Specifically, DiLucente is in a position to assist the jury through his expert opinion regarding an appropriate interest rate to be applied to the loans to MDI and the amount of improper profit distributions Defendants received on partnership units acquired with those loan proceeds. Defendants will have ample opportunity to demonstrate the alleged shortcomings in DiLucente's testimony through vigorous cross-examination at trial.

B. Alleged Conflict of Interest

Defendants' allegation of conflict of interest merits more lengthy discussion. In essence, Defendants contend that DiLucente used information he acquired during his prior engagement by Defendants in the course of developing his expert opinions in this case. Disqualification of an expert may be appropriate when the expert acquired confidential information from the opposing party during a prior engagement. *Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, LLC*, 202 F.R.D. 426, 428 (E.D. Pa. 2001). Plaintiffs contend that the motion to exclude DiLucente is meritless because: (1) Defendants and their counsel consented to the current retention

12

by Plaintiffs; (2) that they waived any objections by waiting seven years to raise such objections on the eve of trial; and (3) that DiLucente did not use any confidential information obtained during the prior engagement in his work on this case.

Specifically, Defendants argue as follows: DiLucente opines that "the loans to MDI were extremely risky and represented unsecured and undocumented loans to a near bankrupt entity controlled by DiGiacobbe and Zontine." Expert Report at 4. During his deposition, DiLucente explained that he knew "at the time I was working for [Defendants]" that they had outstanding receivables that they could not pay and that DiGiacobbe told him on numerous occasions that they were on the verge of bankruptcy. DiLucente Deposition at 92. Therefore, Defendants reason that DiLucente used confidential information obtained during his previous engagement. Plaintiffs acknowledge that DiLucente rendered professional services for Defendants for four years in the early 1990s in the Colkitt litigation, and testified twice on their behalf, but contend that such prior engagement was unrelated to this matter. Plaintiffs further point to DiLucente's deposition testimony that although discussions with Defendants helped form the basis of his expert opinion, those conversations "predominantly occurred" after May 2002 while DiLucente was working for Plaintiffs. In addition, Plaintiffs argue that any prior information obtained from Defendants was financial in nature and not confidential, and was merely duplicative of other information obtained in this case.

Disqualification of an expert witness is a drastic measure that is imposed reluctantly. The standard for disqualification of an expert is much different than that applicable to disqualification of counsel, in view of their distinct roles. As explained in *U.S. ex rel Cherry Hill Convalescent Center, Inc. v. Healthcare Rehab Systems, Inc.*, 994 F. Supp. 244, 249 (D.N.J. 1997) (citations omitted):

> Experts act as sources of information and opinions in order to assist parties and triers of facts to understand evidence. Attorneys act as advocates of their client's positions and, thus, owe a higher level of fiduciary duty to the client than do experts. In *Cordy v. Sherwin-Williams Co.*, this Court applied a two-prong test to determine whether an expert who had a prior relationship with a party should be disqualified. First, was it objectively reasonable for the first party who retained the

expert to believe that a confidential relationship existed? Second, did that party disclose any confidential information to the expert." An expert should be disqualified if both inquiries are answered in the affirmative. Disqualification, however, is inappropriate if either question is answered in the negative. . . . In addition to the two-prong test, the court should balance competing policy objectives in determining whether an expert should be disqualified. The policy objectives that favor disqualification include the court's interest in preventing conflicts of interest and in maintaining judicial integrity. The policy objectives that weigh against disqualification include maintaining accessibility to experts with specialized knowledge and encouraging experts to pursue their professions. In balancing these concerns, courts have considered whether another expert is available and whether the opposing party will be unduly burdened by having to retain a new expert.

The burden is on the party seeking disqualification. *Id.*

Plaintiffs argue that no "confidential information" was disclosed. In *Cherry Hill*, the Court defined the term "confidential information" rather narrowly, as follows (citations omitted):

> Confidential information, in the context of expert disqualification, includes: discussion of the [retaining party's] strategies in the litigation, the kinds of expert [the party] expected to retain, [the party's] views of the strengths and weaknesses of each side, the role of each of the [party's] witnesses to be hired, and anticipated defenses."

The Court made "a distinction between confidential business and financial records and confidential communications related to a particular litigation." *Id.* at 251. Thus, the Court did not disqualify an accounting firm from serving as expert on behalf of the plaintiff even though the firm had conducted five annual audits of the defendant during the time period at issue in the litigation. This case is somewhat distinguishable from *Cherry Hill* because DiLucente's prior engagement did involve the litigation context and DiLucente obtained oral statements in addition to discoverable documents. However, the Court concludes that these differences are insufficient to invalidate the principles set forth in *Cherry Hill*. In this case, Defendants could not have disclosed confidential information about this litigation to DiLucente during his prior engagement in the early 1990s. In *In re Ambassador Group, Inc., Litigation*, 879 F.Supp. 237, 244 (E.D.N.Y. 1994), the Court rejected the argument that insights into Defendants' thinking and management methods obtained during a confidential relationship constituted "confidential information" and thus refused to disqualify the accounting firm from serving as an adverse expert. This Court agrees with the

14

reasoning in these cases. Moreover, the "policy concerns" identified by prior cases weigh heavily in favor of permitting DiLucente to testify. Most tellingly, exclusion of DiLucente on the eve of trial would impose an undue burden on Plaintiffs, including a likely postponement of the trial. Regardless of the merits of the parties' competing positions regarding whether DiLucente properly obtained a waiver of any potential conflict, the fact remains that Defendants were aware of his role on behalf of Plaintiffs as early as 2002 and did not seek his disqualification until some seven years later.[4] In summary, Defendants have not demonstrated a sufficient basis to disqualify DiLucente.

Accordingly, DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY (Document No. 276) is **DENIED**.

6.      Plaintiffs' Motion to Exclude Defendants' Expert

Plaintiffs seek to prevent Defendants from calling Mark Gleason, CPA, as an expert witness due to their alleged failure to amend or supplement their discovery responses. The Court will deny this motion summarily. As noted above, the disqualification of an expert witness on the eve of trial is an extreme measure that courts impose reluctantly. Plaintiffs have not articulated any actual prejudice, and indeed, concede that they have had knowledge of Mr. Gleason's involvement since at least January 2009. If Plaintiffs have not had an opportunity to depose Mr. Gleason, they will be permitted to do so prior to trial.

In accordance with the foregoing, PLAINTIFFS' MOTION FOR SANCTIONS PRECLUDING DEFENDANTS' EXPERT TESTIMONY (Document No. 288) is **DENIED**.

---

[4] Because the Court concludes that no "confidential information" was disclosed, it need not reach the issue of Defendants' alleged conflict waiver and/or consent to this engagement.

15

### 7. Plaintiff's Motion Regarding Newly Identified Evidence

Plaintiffs seek to exclude three pieces of evidence newly identified in Defendants' Supplemental Pretrial Statement filed on April 13, 2009: (1) the testimony of Dr. Thomas Friberg, Angela Weaver's eye doctor; (2) documents concerning 2008 amendments to the partnership agreement; and (3) a December 29, 2008 letter from Angela Weaver to William Kwence. Defendants argue that Dr. Friberg's testimony regarding the nature and extent of Angela Weaver's eyesight is admissible to allow the jury to evaluate her general credibility. Defendants contend that the 2008 partnership agreement amendments (which eliminate the prohibition on taking loans) are relevant because they reflect that Plaintiffs' interests are not representative of AMD and are adverse to the interests of other limited partners. Defendants seek to argue that because certain limited partners supported the 2008 amendments, therefore, "the limited partners supported the loan which underlies this legal dispute." Defendants further point out that Plaintiffs did not make formal discovery requests for these documents and that the documents were created after the discovery period closed. As to the 2008 letter from Mrs. Weaver to William Kwence, Defendants contend that it contains false information regarding the alleged forgeries of her husband's signature and his lack of knowledge when he co-signed for an $8 million loan to launch AMD. Further, Defendants contend that the letter is relevant to show Mrs. Weaver's personal animosity towards Defendants, which impacts her credibility.

The Court will address the three issues seriatim. First, the Court is hard-pressed to comprehend how Mrs. Weaver's eyesight could have any possible relevance to the derivative claims at issue in this trial. Dr. Friberg's testimony will be excluded pursuant to Fed. R. Evid. 401 and 403.

Second, the 2008 amendments to the partnership agreement (after discovery closed) are irrelevant to the issues in this case, which are governed by the partnership agreement as it existed between 1989 and 2000. The views of the limited partners in 2008 are not reflective of their views at the time in question. Moreover, the alleged "support" of those limited partners for taking loans

is contrary to the clear and unambiguous prohibition on taking such loans during the relevant time period. Any possible relevance is substantially outweighed by the considerations set forth in Fed. R. Evid. 403.

Finally, Ms. Weaver's personal feelings regarding the Defendants are a distraction from the derivative claims at issue in this trial. The Court has already determined that the issue of Mrs. Weaver's standing as a derivative plaintiff is moot because the claims may proceed as properly brought by Plaintiff Salvatore. Report and Recommendation at 1-2, 13. This matter is sufficiently complex without exploring the alleged defamation issues that will be addressed in a pending state court action. The alleged hostility of a witness toward a defendant is generally relevant because such feelings of hostility may well influence the manner in which the witness testifies. However, that principle does not necessarily give counsel free rein to "gild that lily." *See United States v. Nesgoda*, 143 Fed. Appx. 427, 429 (3d Cir. 2005) (unpublished) (affirming district court's decision to exclude tape of phone call offered to show personal bias of witness). Thus, this evidence will be precluded unless Plaintiffs open the door, for example, by introducing testimony to the effect that Mrs. Weaver does not harbor ill feelings towards Defendants.

In accordance with the foregoing, PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE EVIDENCE NEWLY IDENTIFIED IN DEFENDANTS' SUPPLEMENTAL PRETRIAL STATEMENT (Document No. 289) is **GRANTED**.

8. Defendants' Motion to Strike as Untimely

Defendants ask the Court to strike Plaintiffs' motions at Document Nos. 288 and 289 as untimely. As to the evidence identified in Defendants' Supplemental Pretrial Statement, Plaintiffs' motion is not untimely. The Supplemental Pretrial Statement was filed on April 13, 2009 (the same day as the motion in limine response deadline). Plaintiffs filed the instant motion promptly thereafter. Although Defendants' contentions are well-taken as to the motion to strike expert testimony, as that issue was known well in advance of the deadlines set forth in the Court's pretrial

17

order, this aspect of the motion is moot in light of the denial of Plaintiffs' motion on the merits.

Accordingly, DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE EVIDENCE IDENTIFIED IN DEFENDANTS' SUPPLEMENTAL PRETRIAL STATEMENT, AND STRIKE PLAINITFFS' MOTION FOR SANCTIONS (Document No. 301) is **DENIED IN PART AND DENIED IN PART AS MOOT**.

SO ORDERED this 30th day of April, 2009.

/s Terrence F. McVerry
United States District Court Judge

cc:       Bernard D. Marcus, Esquire
Robert M. Barnes, Esquire
Moira E. Cain-Mannix
Marcus & Shapira
301 Grant Street
35th Floor, One Oxford Centre
 Pittsburgh, PA 15219-6401

Mary Jo Rebelo
Houston Harbaugh
401 Liberty Avenue
22nd Floor, Three Gateway Center
Pittsburgh , PA 15222-1005

John R. O'Keefe, Jr., Esquire
Metz Lewis
11 Stanwix Street
18th Floor
Pittsburgh, PA 15222

Manning J. O'Connor, II, Esquire
Patrick Sorek, Esquire
Leech Tishman Fuscaldo & Lampl, LLC
525 William Penn Place, 30th Floor
Pittsburgh, PA 15219